111 T.C. No. 18


UNITED STATES TAX COURT


TURNER BROADCASTING SYSTEM, INC. AND SUBSIDIARIES, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


TRACINDA CORPORATION, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 13977-96, 14786-96.    Filed December 23, 1998.


Ps (TBS and Tracinda) and others engaged in a
series of complex commercial transactions that closed
simultaneously.  TBS acquired a publicly held and
traded company (MGM) by way of a reverse triangular
subsidiary merger.  At the same time as the acquisition
by merger, MGM transferred all the shares in its wholly
owned subsidiary (UA) to one of its former
shareholders, Tracinda.  Tracinda then sold some of the
UA shares to former shareholders of MGM pursuant to a
prospectus and subscription agreement, which was
contemplated in the initial agreement.  The
consideration received by MGM for the UA shares was
less than MGM's basis in those shares (UA Loss).  Both
Ps claim a tax consequence from the sale of the UA
shares.  TBS claims the loss was recognized by MGM and
is available to the TBS Group.  Immediately prior to

the transactions, Tracinda and MGM were part of a "Controlled Group" for the purposes of sec. 267, I.R.C., Tracinda claims the UA Loss is deferred and transferred to its basis in the UA shares, by virtue of the operation of sec. 267(f), I.R.C., and sec. 1.267(f)-1T(c), Temporary Income Tax Regs., 49 Fed. Reg. 46997 (Nov. 30, 1984).  (Sec. 267 issue.) Tracinda subsequently sold the UA shares to third parties.

R claims the benefit of the UA Loss should be denied to both parties because the form adopted by Ps does not reflect the substance of the transaction.  R seeks to have the UA transaction recharacterized into a part sale, part redemption transaction.  If recharacterized as a redemption, R contends that sec. 311(a), I.R.C., operates to deny the benefit of the UA Loss to both parties.  (Sec. 311 issue.)

R has denied Ps any tax benefit from the UA Loss. R has filed a motion for summary judgment on the sec. 311 issue.  Both Ps have filed cross-motions for partial summary judgments on the secs. 311 and 267 issues.  These cases have been consolidated to clarify the tax consequences of the transactions common to all the parties.

Held:  The form chosen by Ps was not a fiction that failed to reflect the substance of the transaction.  Esmark, Inc. v. Commissioner, 90 T.C. 171 (1988), affd. 886 F.2d 1318 (7th Cir. 1989), followed. Consequently, sec. 311, I.R.C., has no application to this transaction.

Held, further:  Where a corporation that is a member of a controlled group is acquired by an unrelated third party, thereby terminating the controlled group relationship, and that corporation simultaneously sells an asset at a loss to a member of the former controlled group, sec. 267(f), I.R.C., and sec. 1.267(f)-1T, Temporary Income Tax Regs., 49 Fed. Reg. 46997 (Nov. 30, 1984), do not defer or deny the loss of the selling member, or increase the purchasing member's basis in the asset by the amount of the loss.

William F. Nelson and Suzanne Celeste Feese, for petitioner in docket No. 13977-96.

Richard E. Timbie and Trevor Washington Swett III, for petitioner in docket No. 14786-96.

Robert J. Shilliday, Jr., for respondent.

OPINION

RUWE, Judge: Respondent determined a deficiency in Tracinda Corp.'s (Tracinda) Federal income tax for the taxable year ending January 31, 1991, in the amount of $54,763,119 and an accuracy-related penalty under section 6662(d)[1] in the amount of $10,952,616. Respondent determined deficiencies in Turner Broadcasting System, Inc.'s (TBS) Federal income tax for the taxable year ending December 31, 1991, in the amount of $21,538,821 and for the taxable year ending December 31, 1992, in the amount of $49,050,854. Tracinda's deficiency results from disallowance of a basis adjustment arising out of its acquisition of United Artists Corp. (UA) from MGM/UA Entertainment Co. (MGM) in 1986. TBS acquired MGM simultaneously with the sale of UA to Tracinda. The TBS deficiencies result, in part, from disallowance of net capital loss carryforward deductions originating from the 1986 sale of UA and carried forward into subsequent years. MGM's basis in UA was greater than the consideration received for all the UA shares sold. The

_____

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

difference between MGM's basis in UA and the amount received from Tracinda for all the UA stock is hereafter called the UA Loss.

TBS and respondent jointly moved to sever from the rest of the TBS case what will hereafter be described as the section 311 and section 267 issues. The parties also filed a joint motion for consolidation of docket No. 14786-96 (Tracinda) and docket No. 13977-96 (TBS). On March 11, 1997, the parties' joint motions for issue severance and consolidation were granted.

This matter is before the Court on petitioner TBS' and petitioner Tracinda's Motions for Partial Summary Judgment and respondent's Motion for Summary Judgment, under Rule 121. The first and second stipulations of fact and attached exhibits are incorporated herein.

The parties have asked this Court to decide the following issues as a matter of law: (1) Whether the transaction by which MGM sold stock of UA to Tracinda (the UA Sale) is properly characterized for tax purposes in accordance with its form as a sale, rather than as a constructive redemption of MGM stock subject to section 311 (the section 311 issue); and (2) if the transaction is properly characterized as a sale, whether section 267 and section 1.267(f)-1T(c)(6) and (7), Temporary Income Tax Regs., 49 Fed. Reg. 46998 (Nov. 30, 1984), apply to (a) disallow the UA Loss claimed by MGM on the UA Sale, and (b) increase Tracinda's basis in the UA stock by the amount of the UA Loss (the section 267(f) issue).

## Background

When the respective petitions were filed, TBS was a Georgia corporation having its principal place of business in Atlanta, Georgia, and Tracinda was a Nevada corporation having offices in Las Vegas, Nevada.

In July and early August 1985, TBS and Tracinda and their respective owners entered into negotiations, and subsequently contracts, that changed the ownership of MGM and UA.

At the time of the initial negotiations, Tracinda was an investment and holding company wholly owned by Kirk Kerkorian (Kerkorian). Kerkorian directly owned .075 percent of MGM and indirectly owned 50.066 percent of MGM through Tracinda.

MGM was a publicly held corporation that traded on both the New York and Pacific stock exchanges. UA was a wholly owned subsidiary of MGM. TBS, at all material times, was more than 80 percent beneficially owned by R.E. "Ted" Turner.

As a result of the negotiations, the following documents were executed on August 6, 1985: Agreement and Plan of Merger between TBS, Merger Sub,[2] MGM and UA dated August 6, 1985 (Merger Agreement); Purchase and Sale Agreement between Tracinda and MGM (Purchase and Sale Agreement); Company Option Agreement between TBS and MGM (C-Option); and Option Agreement between Kerkorian,

---

[2]Merger Sub was a company incorporated as a transitory merger subsidiary (TBS Acquisition Corp.) that merged into MGM. MGM was the corporation that survived the merger.

Tracinda, and TBS (Option) (collectively, the transaction documents).  The transaction documents provided for:

(1) TBS' acquisition of MGM (MGM Purchase);[3]

(2) MGM's sale of all the shares in UA to Tracinda; and

(3) Tracinda's sale of shares in UA to some of MGM's former public shareholders (Subscribing Public) and to certain UA executives.[4]  The agreed price for UA was equal to $9 cash per share,[5] and the agreed price of MGM was $29 cash per share.

The consideration for the MGM shares was altered in October 1985 and again in January 1986.  At the conclusion of the transaction, on March 25, 1986, the consideration for the MGM shares was $20 cash and one share of TBS Series A preferred stock (TBS Preferred Stock) for each MGM share.

Prior to the negotiations, MGM had approximately $400 million of public debt outstanding in the form of 10-percent senior subordinated notes due April 15, 1993 (MGM Notes).  The conditions of issue of the MGM Notes are contained in an indenture dated April 15, 1983 (the MGM Indenture).  On August

---

[3]The mechanism that accomplished the reverse triangular subsidiary merger is not in issue in this case.

[4]Pursuant to a prospectus and subscription agreement, 14.3 percent of the UA shares acquired by Tracinda were sold to the Subscribing Public for $9.18 per share.  A total of 6.43 percent of the said UA shares was sold to UA executives.

[5]Under the transaction documents, the capital of UA was to be recapitalized so that it mirrored the number of shares issued by MGM.

31, 1985, MGM's bank debt stood at $98 million, consisting of $89 million in borrowings under a $175 million revolving credit facility, and $9 million under an agreement providing for bank borrowings of up to $10 million to cover daily operating requirements.

In anticipation of the merger, TBS offered to exchange $1,100 of its subordinated notes for each $1,000 principal amount of the MGM Notes, provided the exchanging MGM Note Holder consented to certain modifications of the MGM Indenture. The Merger Agreement did not require TBS to make the exchange offer for the MGM Notes, and TBS' obligation to close its acquisition of MGM was not contingent upon the successful consummation of the exchange offer. However, the exchange offer was conditioned upon consummation of the merger. The exchange offer remained open through March 31, 1986.

The original Merger Agreement and other transaction documents were first executed on August 6, 1985. At that time, MGM believed that its tax basis in UA was not materially different from the $9 per share value of UA set forth in the Merger Agreement. Accordingly, MGM believed and informed TBS that a sale of UA would not produce any material gain or loss. This information was incorrect. MGM's tax basis in the UA shares exceeded the consideration received by MGM. The parties disagree as to the extent of the excess; however, none of the parties have contended that MGM's basis did not exceed the consideration

received.  Tracinda argues that the excess is $271,727,849.  In the revenue agent's report issued to TBS, respondent stated that the UA Loss was $262,696,140.  A loss on the disposition of UA in the amount of $217,612,767 was claimed on TBS' 1986 consolidated return.  TBS now claims the UA Loss is in excess of $262 million.  The excess of basis is hereinafter referred to as the UA Loss.[6]

After ascertaining that MGM's basis in the UA stock substantially exceeded the agreed sale price to Tracinda, the parties entered into an Amended and Restated Agreement and Plan of Merger dated January 15, 1986, between MGM, UA, TBS and others, which provided for the possibility of the UA Loss in clause 6.3(c):

> If, however the sale of New UA [UA] results in a Federal and/or State tax loss, the Company [MGM] shall benefit therefrom; provided, however, that to the extent the Purchaser [TBS] receives an actual tax benefit on any of its post merger consolidated tax returns as a result of such loss, the Company [MGM] shall pay to New UA [UA] the first $12.5 million of Federal and/or State tax benefits from the realization of such loss.

The UA Loss was reported on the TBS Group's[7] 1986 consolidated tax return.  In March 1989, Tracinda filed an amended income tax return for the taxable year ending January 31,

---

[6]For purposes of these proceedings, respondent does not agree to any specific amount.

[7]Unless otherwise specified, a reference to TBS Group is to TBS and its consolidated subsidiaries.

1987, on which it claimed $61,137,114 additional basis in the UA shares sold during that year. This addition to basis is not in issue in these proceedings.[8] On November 1, 1990, Tracinda sold its remaining 35,046,037 shares of UA stock to an unrelated purchaser for $753,313,496. Its cost basis in that stock was $315,414,333 ($9 per share). Tracinda claimed an increase in basis of $178,561,218 when reporting its taxable gain from the sale on its income tax return for the taxable year ending January 31, 1991. That amount reflected a pro rata allocation to Tracinda's basis in its UA shares of a $271,727,849 loss incurred by MGM on its March 25, 1986, sale of UA. Only Tracinda's tax year ending January 31, 1991, is at issue in this case. TBS and the successor corporation to MGM have filed a civil action against Tracinda. That action seeks, inter alia, damages and a declaratory judgment that Tracinda pay any and all benefits attributable to the UA Loss to TBS.[9]

The status of the various parties on March 25, 1986, prior to the closing of TBS' acquisition of MGM and MGM's transfer of UA, was as follows:

[8]It appears that respondent is barred from denying the benefit of the basis adjustment in previous years because the time allowed by the statutory period of limitations for the assessment of tax on such adjustments has expired.

[9]In that suit TBS alleges and Tracinda denies that as part of a post Merger settlement agreement, UA waived its right to receive any part of the tax benefit resulting from the capital loss realized on the sale of UA pursuant to clause 6.3(c) of the Merger Agreement.

a. MGM owed the banks $294,809,215 and owed the holders of the MGM Notes approximately $400 million.

b. Public shareholders (i.e., shareholders other than Kerkorian and Tracinda) owned 24,839,712 shares (49.9 percent) of the 49,745,137 outstanding shares of stock of MGM.

c. Tracinda owned 22,973,585 shares (46.2 percent) of the stock of MGM.

d. Kerkorian owned 1,931,840 shares (3.9 percent) of the stock of MGM.

e. MGM owned all the UA stock, which had been recapitalized to have the same number of outstanding shares as MGM.

f. TBS had raised $1,203,257,700 cash and had arranged to issue 49,745,137 shares of TBS Preferred Stock.

g. Tracinda had received in escrow $64,533,655 from the Subscribing Public on or prior to November 26, 1985, as the subscription price for 7,029,810 shares of UA stock they had subscribed to purchase from Tracinda for $9.18 per share.[10]

h. The UA Executive Stock Purchase Agreements, pertaining to the sale of 3,200,000 shares of UA stock to UA executives, had been executed.

---

[10]Tracinda bore the expenses of its offering of UA shares to the subscribing public shareholders that were estimated to be $1,265,365 ($.18 per share) in the UA Prospectus.

i.  TBS had incorporated the 20 Mirror Subsidiaries, which together with TBS would become the shareholders of MGM as the result of the merger of Merger Sub into MGM on March 25, 1986.

j.  A Disbursing Agent had been appointed for the merger consideration.

A closing occurred on March 25, 1986, pursuant to the final transaction documents and was memorialized by a Closing Memorandum and a Funds Transfer Memorandum.  The parties have stipulated that each of the events memorialized occurred.  Those events were deemed to be simultaneous and included:

a.  TBS and TBS' Merger Sub transferred $994,902,740 and 49,745,137 shares of TBS Preferred Stock to the MGM Shareholders Account established at the Disbursing Agent.

b.  Tracinda delivered its 22,973,585 MGM shares to the Disbursing Agent.

c.  Tracinda acknowledged receipt of $459,471,700 cash and 22,973,585 shares of TBS Preferred Stock from the Disbursing Agent.

d.  At the direction of Tracinda, the Disbursing Agent transferred $447,706,233 from the MGM Shareholders Account to MGM in payment of the purchase price for the UA stock.  This payment was funded from the cash portion of the consideration received by Tracinda for its MGM shares (i.e., Tracinda paid for the UA stock using cash it received from TBS in the MGM Purchase).

e.  MGM delivered to the Disbursing Agent, as transfer agent for UA, share certificates representing 49,745,137 UA shares, which constituted all the issued and outstanding shares of UA. MGM also instructed the Disbursing Agent, as transfer agent for UA shares, to cancel the UA stock certificates held in the name of MGM, duly endorsed for transfer to Tracinda, and to issue to Tracinda UA stock certificates for an aggregate 49,745,137 UA shares.  The Disbursing Agent delivered to Tracinda five certificates of UA common stock representing in aggregate 49,745,137 shares.

f.  MGM transferred $294,809,214.66 to its banks in satisfaction of its bank borrowings.

g.  MGM transferred to UA $17,275,000, which represented the amount payable by MGM to UA under clause 6.2 of the Merger Agreement.[11]

After the transfers described above, the balance of MGM's account at the Disbursing Agent was approximately $140,399,278.34, with MGM having the right to instruct the Disbursing Agent with respect to the investment or transfer of such funds.

_____

[11]Clause 6.2 provided for the transfer of assets between MGM and UA to give effect to the terms of the Merger Agreement and in particular to reflect the agreement that there would be adjustments made to reflect the position of UA as if UA had operated as an independent company since May 31, 1985, until the transaction closed on Mar. 25, 1986.

Immediately following the closing, pursuant to MGM's prior irrevocable instructions, the Disbursing Agent transferred $22,725,000 from MGM's account to UA's account in partial payment of amounts due from MGM to UA under clause 6.4 of the Merger Agreement.[12]  On or shortly after March 25, 1986, MGM made a net intercompany loan of approximately $107.7 million cash to TBS, in accordance with TBS' customary cash management procedures.  This intercompany loan was reflected on MGM's books as an intercompany receivable (i.e., as an asset of MGM).

The status of the parties on March 25, 1986, after the completion of the transactions contemplated in the transaction documents, was as follows:

a.  TBS, directly and through wholly owned subsidiaries, owned 100 percent of MGM.

b.  TBS had disbursed $994,902,740 cash and 49,745,137 shares of TBS Preferred Stock and received $107.7 million cash in an intercompany loan from MGM.

c.  MGM had disposed of UA.

d.  MGM had received $447,706,233 cash, which it had used in part to prepay its $294,809,215 debt to the banks and to satisfy a $40 million obligation to UA.

_____

[12]Clause 6.4 of the Merger Agreement provided for "Post Closing Adjustment[s]". These adjustments related to the allocation of the economic, financial and legal consequences of transactions occurring during the period from May 31, 1985, to March 25, 1986, as reflected in the intercompany accounts between MGM and UA.

e.  Tracinda owned 39,515,327 shares of UA (79.44 percent), 22,973,585 shares of TBS Preferred Stock (46.18 percent), and $76,299,122 cash, which includes $64,533,655 ($9.18 per share) cash paid in escrow by the Subscribing Public pursuant to Tracinda's offering of UA shares.

f.  Kerkorian owned 1,931,840 shares (3.88 percent) of TBS Preferred Stock and $38,636,800 cash.

g.  The MGM public shareholders owned 24,839,712 shares (49.93 percent) of TBS Preferred Stock and $496,794,240 cash.

h.  The Subscribing Public owned 7,029,810 shares (14.13 percent) of UA, for which they had paid $64,533,655 ($9.18 per share).

i.  UA executives owned 3,200,000 shares of UA (6.43 percent), for which they subsequently paid $28,800,000 to Tracinda.

## Discussion

### A.  Whether Summary Judgment Is Appropriate

Summary judgment is intended to expedite litigation and avoid unnecessary and expensive trials.  Northern Ind. Pub. Serv. Co. & Subs. v. Commissioner, 101 T.C. 294, 295 (1993); Florida Peach Corp. v. Commissioner, 90 T.C. 678, 681 (1988); Shiosaki v. Commissioner, 61 T.C. 861, 862 (1974).

Summary judgment is appropriate where there is no genuine issue as to any material fact and a decision may be rendered as a matter of law. Rule 121(b); Sundstrand Corp. v. Commissioner, 98 T.C. 518, 520 (1992), affd. 17 F.3d 965 (7th Cir. 1994); Jacklin v. Commissioner, 79 T.C. 340, 344 (1982). In deciding whether to grant summary judgment, the Court must consider the factual materials and inferences drawn from them in the light most favorable to the nonmoving party. Bond v. Commissioner, 100 T.C. 32, 36 (1993); Naftel v. Commissioner, 85 T.C. 527, 529 (1985). If the conditions of summary judgment are otherwise satisfied with respect to a single issue or less than all the issues in a case, then partial summary judgment may be granted, even though all the issues in the case are not disposed of. Rule 121(b); Naftel v. Commissioner, supra.

The parties agree that no issues of material fact are in dispute in relation to the section 311 issue or the section 267 issue and that we may render judgment regarding those issues under Rule 121(b).

B. Section 311 Issue

The form adopted by the parties to the transaction consists of mutually dependent simultaneous sales of all the issued shares in MGM to TBS and MGM's sale of all the issued shares in UA to Tracinda. Respondent views this series of transactions as

integrated, mutually dependent steps in an overall plan.  We agree.  Indeed, petitioners do not characterize it differently.

Respondent, however, seeks to have the transactions recharacterized for tax purposes using either the step transaction or the substance-over-form doctrine.  Respondent urges us to reject the form adopted by the parties.  That form reflects events that actually happened, in favor of what respondent characterizes as the substance of the transaction.  Respondent summarizes his position as follows:

> The substance of this transaction should be determined by applying the terms of the [f]inal Merger Agreement and the Purchase and Sale Agreement in tandem, since the agreements were completely interdependent, and the steps of the transaction occurred simultaneously. Viewing this transaction as a whole, TBS should be treated as making a capital contribution to MGM equivalent to the value of UA.  * * *  Further, in a transaction which is in substance a bootstrap acquisition, the portion of Tracinda's MGM stock equal in value to the UA stock was redeemed by MGM in exchange for the UA stock.  * * *

In respondent's recharacterization of the "substance of the transaction", MGM is deemed to have distributed its UA stock to Tracinda and the Subscribing Public in exchange for a portion of the shareholders' MGM stock.  If we were to agree with respondent's recharacterization as a redemption, section 311(a) would provide that no loss would be recognized on MGM's distribution of UA shares in redemption of its own shares.

Respondent justifies the proposed recharacterization on the ground that the form adopted by the parties "does not comport with economic reality".  Respondent's argument in its purest terms is that sale of all the issued shares in MGM to the TBS Group and MGM's sale of all the issued shares in UA to Tracinda cannot be viewed as occurring simultaneously for tax purposes. Respondent contends the transactions must be assigned a sequential order for tax purposes.  Respondent further argues that since simultaneous sale transactions cannot be recognized for tax purposes, it is necessary to recharacterize the transaction to reflect its true substance.

We find respondent's argument that the sales could not occur simultaneously for tax purposes to be no more than superficially appealing, unsupported by authority, and without merit in view of the stipulated facts.  On brief, respondent cites no authority for the proposition that "some kind of [sequential] ordering of the steps of the transaction is necessary for tax purposes to determine the tax consequences."  Transactions that occur simultaneously or are deemed by law to have occurred concurrently or simultaneously are commonplace.[13]  In G.M. Trading Corp. v.

_____

[13]The regulations speak of simultaneous events in at least 22 places.  For instance, sec. 1.351-1(a)(1), Income Tax Regs., provides:

"immediately after the exchange" does not necessarily require simultaneous exchanges by two or more persons,
(continued...)

Commissioner, 106 T.C. 257, 267 (1996), revd. on other grounds 121 F.3d 977 (5th Cir. 1997), we examined some of the tax consequences of a simultaneous transaction, stating: "the simultaneous nature of a number of steps does not require all but the first and the last (or "the start and finish") to be ignored for Federal income tax purposes."

The regulations under section 267(f), discussed infra p. 23, would also seem to impliedly acknowledge simultaneous transactions. See sec. 1.267(f)-1T(c)(1), Temporary Income Tax Regs., 49 Fed. Reg. 46997 (Nov. 30, 1984), sec. 1.1502-13(a)(1)(i), Income Tax Regs., discussed infra pp. 31-34. These regulations dealing with "intercompany transactions" address a situation involving the purchase and sale of an asset between corporations that are members of the same group after the sale transaction but are not necessarily members of the same group before the transaction. This seems, by logical implication, to contemplate a sale of an asset and the simultaneous association or disassociation of group members. We are dealing exactly with

---

[13](...continued)
but comprehends a situation where the rights of the parties have been previously defined and the execution of the agreement proceeds with an expedition consistent with orderly procedure. * * * [Emphasis added.]

In the regulations, we have not been able to locate reference to sequential ordering for tax purposes being required when simultaneous transactions are mentioned. See also sec. 1.707-3(f), Example (1). (Treatment of simultaneous transfers as a sale.), Income Tax Regs.

this type of situation; i.e., the sale of an asset between members of a controlled group and the simultaneous disassociation of the buyer and the seller.

Petitioners seek to have the above-described transactions taxed in accordance with the form adopted by them. Petitioners argue that both substance and form are aligned and that the form adopted should determine the tax consequences. Petitioners cite this Court's reasoning in Esmark, Inc. & Affiliated Cos. v. Commissioner, 90 T.C. 171 (1988), affd. without published opinion 886 F.2d 1318 (7th Cir. 1989), as authority for that proposition.

In Higgins v. Smith, 308 U.S. 473, 477 (1940), the Supreme Court stated:

> the Government may not be required to acquiesce in the taxpayer's election of that form for doing business which is most advantageous to him. The Government may look at actualities and upon determination that the form employed for doing business or carrying out the challenged tax event is unreal or a sham may sustain or disregard the effect of the fiction as best serves the purposes of the tax statute. * * *

However, in order to apply either the substance-over-form doctrine or the step-transaction doctrine, we must determine that the substance of the transaction differs from its form. If substance follows form then this Court will respect the form chosen by the taxpayer. Esmark, Inc. & Affiliated Cos. v. Commissioner, supra.

Even if alternative explanations are available to account for the results of a transaction, this Court will not disregard the form of the transaction if it accounts for the transaction at least as well as alternative recharacterizations.[14]  This is particularly true in cases that deal with public companies.  As we stated in Esmark, Inc. & Affiliated Cos. v. Commissioner, supra at 183: "Congress enacted a statute under which tax consequences are dictated by form; to avoid those consequences, respondent must demonstrate that the form chosen by petitioner was a fiction that failed to reflect the substance of the transaction."  (Emphasis added.)

In all the cases cited to us where this Court adopted a substance-over-form argument, a desire to gain a tax benefit, through the use of meaningless steps or some other tax fiction,[15] was present.  Respondent can point to no such tax fiction or

---

[14]See Grove v. Commissioner, 490 F.2d 241 (2d Cir. 1973), affg. T.C. Memo. 1972-98; Carrington v. Commissioner, 476 F.2d 704, 709 (5th Cir. 1973), affg. T.C. Memo. 1971-222.

[15]For an example of a transaction that was considered to be a tax fiction by the Supreme Court, see Knetsch v. United States 364 U.S. 361 (1960).  That case is authority for the proposition that

> the Commissioner * * * [may] disregard transactions
> which are designed to manipulate the Tax Code so as to
> create artificial tax deductions [benefits].  They do
> not allow the Commissioner to disregard economic
> transactions, * * * which result in actual, non tax-
> related changes in economic position.  [Northern Ind.
> Pub. Serv. Co. & Subs. v. Commissioner, 115 F.3d 506,
> 512 (7th Cir. 1997), affg. 105 T.C. 341 (1995).]

meaningless step.[16]  As we stated in <u>Esmark, Inc. & Affiliated</u>
<u>Cos. v. Commissioner</u>, 90 T.C. at 195:

> The existence of an overall plan does not alone,
> however, justify application of the step-transaction
> doctrine.  Whether invoked as a result of the "binding
> commitment," "interdependence," or "end result" tests,
> the doctrine combines a series of individually
> meaningless steps into a single transaction.  * * *

At the time the original transaction documents, which establish
the form of the transactions, were executed the parties were
unaware of the tax benefit in issue.  The absence of a tax motive
lends credence to petitioners' position that the transaction is
what it purports to be; i.e., that the structure of the
transaction was dictated by a business purpose and that substance
and form are aligned.

In order to recharacterize the transaction, respondent must
have a logically plausible alternative explanation that accounts
for <u>all</u> the results of the transaction.  The explanation may

---

[16]Respondent cites <u>Estate of Schneider v. Commissioner</u>, 88
T.C. 906 (1987), affd. 855 F.2d 435 (7th Cir. 1988), for the
proposition that the step-transaction doctrine need not solely be
employed to eliminate meaningless steps.  We do not read that
case to stand for that proposition.  That case explicitly adopts
the elimination of meaningless steps analysis contained in
<u>Minnesota Tea Co. v. Helvering</u>, 302 U.S. 609, 613-614 (1938).
Additionally, the case itself cites the existence of meaningless
steps (issue of preendorsed checks to employees for purported
stock purchase) as the reason for the application of the step-
transaction doctrine.  The Court of Appeals for the Seventh
Circuit affirmed this Court's recharacterization; however, it
chose to arrive at the same conclusion using a substance-over-
form analysis (parties' rights different from form used).

combine steps, but if it invents new ones, "Courts have refused to apply the step-transaction doctrine in this manner."  Esmark, Inc. & Affiliated Cos. v. Commissioner, supra at 196.  "'Useful as the step transaction doctrine may be * * * it cannot generate events which never took place just so an additional tax liability might be asserted.'"  Grove v. Commissioner, 490 F.2d 241, 247-248 (2d Cir. 1973), affg. T.C. Memo. 1972-98 (quoting Sheppard v. United States, 176 Ct. Cl. 244, 361 F.2d 972, 978 (1966)).

Respondent's proposed recharacterization does not adequately account for, among other things, why TBS would make a capital contribution to MGM[17] and then immediately make an intercompany loan of $107.7 million back to itself.  While it is understandable that a parent corporation would transfer excess cash received from the sale of assets by a subsidiary to itself, it is hard to imagine a company making a capital contribution to a subsidiary in order to lend itself money as respondent postulates is, in part, the substance of this transaction.  The fact that the amount of the capitalization postulated by respondent corresponds to the value of the asset purported to be sold is also suggestive of the fact that the asset was in fact sold.

---

[17]In respondent's proposed recast of the substance of the transaction, it is necessary to include a capitalization step to account for the fact that MGM's net worth did not decrease, as would be expected, had a redemption actually taken place.

The hypothetical or constructive redemptions of shares by MGM in exchange for UA shares proposed by respondent would differ in price and form of consideration from shareholder to shareholder. In the instant case, the Subscribing Public paid Tracinda $9.18 per UA share in November 1985. Those shareholders received the full merger consideration when they tendered their shares in MGM in March 1986.[18] Tracinda and certain UA executives paid $9 per UA share. Such a non pro rata redemption would appear at a variance with the normal rules for the governance of public companies.[19] Additionally, it leaves unexplained the $64,533,655 payment made to Tracinda by the Subscribing Public.[20]

Finally, respondent's argument adds a step that did not occur. The addition of the "capitalization" step proposed by respondent is the type of tax fiction that the step-transaction doctrine applies to. It is an impermissible attempt to turn

---

[18]The Subscribing Public's payment of the additional $9.18 per share in November 1985 is described by respondent as "Reimbursing Tracinda" (a fellow shareholder) for its costs in arranging the subscription offering (respondent's deemed redemption of MGM shares for UA shares).

[19]Respondent takes the position that such corporate formalities are "irrelevant" to the tax substance of the transaction.

[20]Respondent takes the position: "In substance, this payment was a nullity. * * * [It] was part of a circular cash flow that should be disregarded. * * * [Each] subscribing public shareholder was reimbursed in merger consideration".

simultaneous sale transactions into a transaction dressed as a redemption, in order to deny a legitimate tax consequence.

In summary, respondent fails to demonstrate a tax fiction, a misalignment of the parties' rights and the form adopted by them, a meaningless step, or a nonbusiness purpose to support invocation of the step transaction or other substance-over-form doctrine. We hold that the transactions in issue should be taxed in accordance with the form actually adopted and carried out by petitioners. Consequently, there was no deemed redemption of MGM shares, and section 311(a) has no application to this transaction.

C. Section 267 Issue

Having determined that the proper characterization of the transaction is the form adopted by petitioners, it is necessary to determine the applicability of section 267(f) and section 1.267(f)-1T, Temporary Income Tax Regs., 49 Fed. Reg. 46997 (Nov. 30, 1984) (the 1984 temporary regulation). The 1984 temporary regulation was in force until superseded by the final regulation, section 1.267(f)-1, Income Tax Regs., July 18, 1995. This final regulation is prospective only and applies with respect to transactions occurring in years beginning on or after July 12, 1995. T.D. 8597, 1995-2 C.B. 147, 160.

Respondent now argues and Tracinda agrees, that the transaction by which MGM sold stock in UA to Tracinda (the UA

Sale) should be treated as a related party sale covered by section 267(f). Respondent and Tracinda argue that Tracinda and Kerkorian had control of MGM when the UA Sale occurred. Respondent concedes MGM was not part of the Tracinda and Kerkorian controlled group immediately after the sale. Respondent considers control prior to the sale as sufficient to establish that the UA Sale was a sale "between members of the same controlled group."[21] Respondent and Tracinda further argue that this interpretation is consistent with the 1984 temporary regulation. As a consequence of this view, respondent's present position is that the UA Loss should be denied in part to MGM[22] and should be instead transferred to the basis of Tracinda's UA stock.[23] Respondent's proposed reallocation of the loss is made pursuant to respondent's interpretation of paragraph (c)(6) and (7) of the 1984 temporary regulation.

---

[21]Respondent's argument is based on the application of the "binding commitment test" enunciated in a line of cases discussed infra pp. 36-37.

[22]Respondent would disallow that part of the UA Loss that is proportionate to the number of shares purchased by Tracinda, on its own behalf and on behalf of the UA executives, to the total number of UA shares purchased. Respondent believes that Tracinda should be viewed as an agent for the Subscribing Public and that the basis shift rules should not apply to the 14 percent of UA stock acquired by the Subscribing Public.

[23]Respondent's notice of deficiency to Tracinda dated Apr. 24, 1996, however, states that "sections 267(a) and 267(f) do not apply to allow a basis adjustment in the subsequent sale of MGM/UA Communications Co. [UA] common stock."

TBS argues that section 267(f) has no application to the UA Sale.  Alternatively, even if section 267(f) does apply, TBS takes the position that paragraph (c)(6) and (7) of the 1984 temporary regulation do not prevent MGM's deduction of the UA Loss because MGM and Tracinda were not members of the same controlled group immediately after the UA Sale.  TBS takes the position that the requirement for there to be a controlled group relationship immediately after the sale is a consequence of the 1984 temporary regulation's adoption of substantial portions of the consolidated return regulations.[24]

In order properly to understand the parties' arguments, it is useful to give an overview of the operation of section 267. Section 267(a)(1) provides in part:

> No deduction shall be allowed in respect of any loss
> from the sale or exchange of property, directly or
> indirectly, between persons specified in any of the
> paragraphs of subsection (b).  * * *

---

[24] TBS additionally argues that if the 1984 temporary regulation produces the result respondent advocates, it is invalid.  TBS argues that par. (c)(6) and (7) of the 1984 temporary regulation, if applicable in this case, are invalid because they disallow, rather than defer, a sec. 267(f) loss to the seller (MGM), reincarnate the disallowed loss into its prerecognition state as basis, and relocate that basis to somebody else (Tracinda), thereby permanently denying the taxpayer (MGM) the benefit of the UA Loss.  In view of our interpretation of the scope of the 1984 temporary regulation, it is not necessary for us to consider the invalidity argument.  We note that TBS' invalidity argument was made moot for taxable years beginning after July 12, 1995, by the removal of the loss relocation provisions in the Commissioner's final regulations. See infra note 29.

Section 267(b) enumerates certain relationships. Most of the relationships enumerated are intrafamily or equivalent relationships where there is a unity of economic interest. The section also provides that members of a controlled group as defined in subsection (f) are among the enumerated relationships. Section 267(d) provides, in general terms, that if a loss has been disallowed under section 267(a)(1) only so much of the gain on the subsequent resale of the property as exceeds the loss is recognized by the related party purchaser. However, section 267(f)(2) requires different treatment for sales between members of a controlled group. Section 267(f) provides in relevant part:

(f) Controlled Group Defined; Special Rules Applicable to Controlled Groups.--

(1) Controlled group defined.--For purposes of this section, the term "controlled group" has the meaning given to such term by section 1563(a), except that--

(A) "more than 50 percent" shall be substituted for "at least 80 percent" each place it appears in section 1563(a), and

(B) the determination shall be made without regard to subsections (a)(4) and (e)(3)(C) of section 1563.

(2) Deferral (rather than denial) of loss from sale or exchange between members.--In the case of any loss from the sale or exchange of property which is between members of the same controlled group and to which subsection (a)(1) applies (determined without regard to this paragraph but with regard to paragraph (3))--

(A) subsections (a)(1) and (d) shall not apply to such loss, but

(B) such loss shall be deferred until the property is transferred outside such controlled group and there

would be recognition of loss under consolidated return principles or until such other time as may be prescribed in regulations.  [Emphasis added.]

The parties have stipulated that prior to the UA Sale, Tracinda, MGM, and UA were members of a section 267(f) controlled group (the Tracinda Group).  After the completion of the UA Sale on March 25, 1986, MGM was no longer part of the Tracinda Group.

Section 267(f) is silent on what constitutes a sale between members of the same controlled group or whether deferral ends when the selling member leaves the controlled group.  This raises the question of whether deferral under section 267(f) requires that the relevant parties be members of the same controlled group before and after the sale.  Because there is an ambiguity in the statute in this regard, we look to the legislative history to see whether Congress manifested an intent that would resolve the issue.  The relevant part of the Senate report states:

The bill extends the loss disallowance and accrual provisions of section 267 (as well as other provisions of the Code applicable to related parties defined under section 267) to transactions between certain controlled corporations.  For purposes of these loss disallowance and accrual provisions, corporations will be treated as related persons under the controlled corporation rules of section 1563(a), except that a 50-percent control test will be substituted for the 80-percent test. These rules are not intended to overrule the consolidated return regulation rules where the controlled corporations file a consolidated return.  In the case of controlled corporations, losses will be deferred until the property is disposed of (or collection of a receivable is made) by the affiliate to an unrelated third party in a transaction which results in a recognition of gain or loss to the transferee, or

the parties are no longer related.  In a transaction
where no gain or loss is recognized by the transferee,
the loss is deferred until the substitute basis
property is disposed of.  [S. Prt. 98-169 (Vol. 1), at
496 (1984); fn. ref. omitted; emphasis added.]

The conference committee report provides:

   The provision generally follows the Senate
amendment with the following modifications:

              *    *    *    *    *    *    *

   (3) The operation of the loss deferral rule is
clarified to provide that any loss sustained shall be
deferred until the property is transferred outside the
group, or until such other time as is provided by
regulations.  These rules will apply to taxpayers who
have elected not to apply the deferral intercompany
transactions rules, except to the extent regulations
provide otherwise.  [H. Conf. Rept. 98-861, at 1033
(1984), 1984-3 C.B. (Vol. 2) 287; emphasis added.]

The legislative history regarding section 267(f) indicates
that it was intended to "extend" the related party provisions of
section 267 even though subsection (f)(2)(A) makes subsections
(a)(1) and (d) inapplicable.[25]  Nevertheless, there is a general
theme that runs through the gain recognition limitation in
section 267(d) and the loss deferral provisions of subsection (f)
in that they both prevent an immediate loss deduction to the
seller and accrue the loss either in terms of a limited gain
recognition to the purchaser pursuant to section 267(d) or as a
deferral of the tax benefit of the loss pursuant to section

[25]Sec. 267(f)(2)(A) provides:  "subsections (a)(1) and (d)
shall not apply to such loss".

267(f).  We think what Congress intended to "extend" was the class of transaction in which there would be a delay, of some kind, in the recognition of a loss until there was an economically genuine realization of the loss.  See <u>McWilliams v. Commissioner</u>, 331 U.S. 694 (1947); <u>Hassen v. Commissioner</u>, 599 F.2d 305, 309 (9th Cir. 1979), affg. 63 T.C. 175 (1974).

It is clear from the legislative history that the consolidated return rules were to be applied where controlled corporations filed consolidated returns.  The Tracinda Group did not file consolidated returns that included MGM during the relevant periods.  The statute itself provides that a deferred loss of a member of a controlled group would be "deferred until the property is transferred outside such controlled group and there would be recognition of loss under consolidated return principles or until such other time as may be prescribed in regulations."  Sec. 267(f)(2)(B).  The property (UA stock) was not transferred out of the Tracinda Group as a result of the March 25, 1986, transactions.  Rather, MGM, the selling member, left the controlled group on that date.  We therefore turn to the 1984 temporary regulation, in effect for the years in issue, which was applicable to controlled groups' not filing a consolidated return.[26]

---

[26]A separate temporary regulation was promulgated for companies in a controlled group that filed consolidated returns. See sec. 1.267(f)-2T, Temporary Income Tax Regs., 49 Fed. Reg.
(continued...)

The 1984 temporary regulation provides in relevant part:

     (c)  Deferral and restoration of loss <u>under</u> <u>consolidated returns principles</u>--(1) General rule.  <u>Except</u> <u>as otherwise provided in this section, the rules for</u> <u>deferred intercompany transactions in § 1.1502-13 of the</u> <u>consolidated return regulations apply under section</u> <u>267(f)(2) to the deferral and restoration of loss</u> on the sale of property directly or indirectly between M1 and M2 as if--

          (i) the taxable year in which the sale occurred were a consolidated return year (as defined in § 1.1502-1(d)) and

          (ii) all references to a "group" or an "affiliated group" were to a controlled group.

               *    *    *    *    *    *    *

     (6) <u>Exception to restoration rule for selling member</u> <u>that ceases to be a member</u>.  If a selling member of property [sic] for which loss <u>has been deferred</u> ceases to be a member when the property is <u>still owned by another member</u>, then, for purposes of this section, § 1.1502-13(f)(1)(iii)[27]

---

     [26](...continued)
46997 (Nov. 30, 1984).

     [27]Sec. 1.1502-13(f)(1)(iii), Income Tax Regs., 38 Fed. Reg. 758 (June 4, 1973), at the relevant time provided:

     (f) Restoration of deferred gain or loss on dispositions, etc.--(1) General rule.  The remaining balance (after taking into account any prior reductions under paragraphs (d)(3) and (e)(3) of this section) of the deferred gain or loss attributable to property, services, or other expenditure shall be taken into account by the selling member as of the earliest of the following dates:

               *    *    *    *    *    *    *

          (iii) Immediately preceding the time
                                        (continued...)

shall not apply to restore that deferred loss and that loss shall never be restored to the selling member.

(7) Basis adjustment and holding period. If paragraph (c)(6) of this section precludes a restoration for property, then the following rules apply:

(i) On the date the selling member ceases to be a member, the owning member's basis in the property shall be increased by the amount of the selling member's <u>unrestored deferred loss at the time it ceased to be a member</u> ("increase amount"). [Emphasis added.]

The 1984 temporary regulation does not explicitly contain a definition of what constitutes a sale between members of a controlled group. However, it does generally incorporate section 1.1502-13, Income Tax Regs., of the consolidated return regulations that deal with "deferred intercompany transactions". These regulations are said to apply, except as otherwise provided in the 1984 temporary regulation. No express provision can be found in the 1984 temporary regulation that defines the scope of transactions covered other than the reference to deferred "intercompany transactions". The term "intercompany transactions" is not itself defined in the 1984 temporary regulation. However, section 1.1502-13, Income Tax Regs., which is referred to and made applicable by the 1984 temporary

_____

[27](...continued)
when either the selling member or the member which owns the property ceases to be a member of the group;

regulation, defines "intercompany transactions" and "deferred intercompany transaction" as follows:

>        (a)  Definitions.--For purposes of §§ 1.1502-1 through 1.1502-80:
>
>>        (1)  "Intercompany transaction."  (i) Except as provided in subdivision (ii) of this subparagraph, the term "intercompany transaction" means a transaction during a consolidated return year [taxable year in which the sale occurred] between corporations which are members of the same [controlled] group <u>immediately after</u> such transaction.* * *
>>
>>        *        *        *        *        *        *
>>   *
>>
>>        (2) "Deferred intercompany transaction".
>> The term "deferred intercompany transaction"
>> means--
>>            (i) The sale or exchange of property,
>>
>>        *        *        *        *        *        *        *

>    in an intercompany transaction.

The 1984 temporary regulation provides that, except as otherwise provided, "the rules for deferred intercompany transactions in § 1.1502-13 of the consolidated return regulations apply under section 267(f)(2)".  49 Fed. Reg. 46997 (Nov. 30, 1984).  These words are intended to govern the application of section 267(f).  By this temporary regulation, respondent has clarified and limited the operation of section 267(f)(2) to what are defined to be "intercompany transactions". When the 1984 temporary regulation is read in light of the definition of intercompany transactions in the consolidated

return regulations, the UA Sale would not be covered because immediately after the completion of the sale the parties were not members of the same controlled group.

Respondent argues that paragraph (c)(6) and (7) of the 1984 temporary regulation constitutes exceptions to the application of section 1.1502-13, Income Tax Regs., of the consolidated return regulations. This is partly true; however, the exception is to the "restoration" of loss rule in section 1.1502-13(f)(1)(iii), Income Tax Regs. Section 1.1502-13(f)(1)(iii), Income Tax Regs., deals with the situation of a selling member that leaves the controlled group <u>after</u> having engaged in a deferred intercompany transaction. But when there has been no deferred intercompany transaction, as defined in section 1.1502-13(a), Income Tax Regs., paragraph (f)(1)(iii) has no application, and it follows that the exception to paragraph (f)(1)(iii) contained in paragraph (c)(6) and (7) of the 1984 temporary regulation also has no application.

After considering the overall regulatory context and the specific language used in paragraph (c)(6) and (7) of the 1984 temporary regulation, we conclude that paragraph (c)(6) and (7) does not apply to the UA Sale, which was part of the overall transaction that simultaneously ended the controlled group relationship and transferred the UA shares to Tracinda. The fact pattern that is dealt with in paragraph (c)(6) and (7) of the 1984 temporary regulation assumes that an intercompany

transaction has occurred <u>before</u> the selling member leaves the controlled group.  The paragraph talks of a loss that "has been deferred".  It also refers to property "still owned" when the selling member departs the group and of an "unrestored deferred loss".  We give effect to the use of the past tense in the 1984 temporary regulation.  In other words, before paragraph (c)(6) and (7) of the 1984 temporary regulation become operative, the loss must have been deferred as an "intercompany transaction" prior to the dissociation of the seller from the controlled group.[28]  The preamble to the 1984 temporary regulation adds additional weight to this interpretation.  It states in relevant part:

> Accordingly, the temporary regulations provide that if a member (M1) sells property to another member (M2), and <u>thereafter</u>, while M2 <u>still</u> holds the property, M1 ceases to be a member of the group, then M1's unrestored deferred loss for property at the time M1 ceases to be a member will never be restored to M1. * * *  [T.D. 7991, 1985-1 C.B. 71, 73; emphasis added.]

The MGM Purchase and UA Sale occurred simultaneously. Immediately after the transaction, MGM was not a member of the controlled group that included Tracinda.  As a consequence, there

---

[28]We note this is the same view as is expressed by the authors of 1 Dubroff et al., Federal Income Taxation of Corporations Filing Consolidated Returns, sec. 31.11[6], at 31-246 (2d ed. 1998), stating:  "The fact pattern addressed by the prior regulations [the 1984 temporary regulation] involved an intercompany sale at a loss <u>followed by</u> * * * [Seller] leaving the group."  (Emphasis added.)

was no "deferred intercompany transaction", "loss that has been deferred", or "unrestored deferred loss at the time it [MGM] ceased to be a member" of the controlled group.[29]

None of the parties have directed us to any case law interpreting the scope of section 267(f).[30] We have, however, been directed to a series of cases which interpret what is now section 267(a)(1) and (b)(2). Federal Cement Tile Co. v. Commissioner, 40 T.C. 1028 (1963), affd. 338 F.2d 691 (7th Cir.

---

[29] We note that the exception to restoration rule contained in paragraph (c)(6) and (7) of the 1984 temporary regulation was eliminated by a final regulation published in 1995. When the Commissioner proposed this regulation in 1994, the preamble to the proposed sec. 1.267(f)-1, Income Tax Regs., 1994-1 C.B. 724, 732, stated:

> The current regulations applicable to controlled groups [sec. 1.267(f)-1T] generally conform to the basic intercompany transaction rules applicable to consolidated groups. * * *
>
> The current regulations also provide that if S sells property to B at a loss, and the property is still owned by B when S ceases to be a member of the same controlled group, S never takes the loss into account. Instead, B's basis in the property is increased by an amount equal to S's unrestored loss.
>
> The proposed regulations eliminate the rule that transforms S's loss into additional basis in the transferred property when S ceases to be a member of the controlled group. Instead, the proposed regulations generally allow S's loss immediately before it ceases to be a member [of the controlled group]. * * *

[30] Sec. 267(f) operates on transactions between parties defined in subsec. (b)(3), which provides: "Two corporations which are members of the same controlled group (as defined in subsection (f))".

1964); <u>Moore v. Commissioner</u>, 17 T.C. 1030 (1951), affd. 202 F.2d 45 (5th Cir. 1953); <u>W. A. Drake, Inc. v. Commissioner</u>, 3 T.C. 33 (1944), affd. 145 F.2d 365 (10th Cir. 1944). These cases are cited for the proposition that the proper time to test for control is when there is a binding commitment to sell. However, these cases do not deal with section 267(f) and the aforementioned regulations. Additionally, the treatment afforded a loss from a transaction between members of a controlled group is not the same as the treatment afforded to a loss between parties otherwise specified in section 267(b). We do not think it likely that Congress would specify a different treatment if there were no relevant distinction to be drawn.[31] We must be cautious in applying judicial glosses developed by the courts to prevent technical avoidance of the purpose of a statute (loss disallowance on intrafamily transactions) to a new situation (the controlled group provisions). This caution is intensified when to do so would conflict with our reading of the regulations.

---

[31]The controlled group provisions of sec. 267(f) do not share a common ancestry with the other relationships dealt with in sec. 267. The current subsecs. (b)(3) and (f) of sec. 267 were first inserted into the Code in 1984 by the Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 174(b)(2) to (3), 98 Stat. 705. They had no counterpart in the 1939 or the 1954 Codes. In contrast, the provisions now embodied in sec. 267(b)(1) and (2) can be traced back to sec. 24(b)(1)(A) and (B) of the 1939 Code. <u>Federal Cement Tile Co. v. Commissioner</u>, 40 T.C. 1028 (1963), affd. 338 F.2d 691 (7th Cir. 1964); <u>Moore v. Commissioner</u>, 17 T.C. 1030 (1951), affd. 202 F.2d 45 (5th Cir. 1953); <u>W. A. Drake, Inc. v. Commissioner</u>, 3 T.C. 33 (1944), affd. 145 F.2d 365 (10th Cir. 1944) (all interpret sec. 24(b)(1)(B) of the 1939 Code).

The words of the 1984 temporary regulation which make the rules for "deferred intercompany transaction" of section 1.1502-13, Income Tax Regs., applicable to deferral under section 267(f) militate against use of the "binding commitment test" in the controlled group situation.  Pursuant to that regulation, the controlled group relationship is tested <u>immediately after</u> the transaction, not when the binding commitment is entered into.  Application of the "binding commitment test" depends on the controlled group relationship before the transaction and therefore would conflict with the 1984 temporary regulation.

Finally, incorporation of the "binding commitment test" into section 267(f) jurisprudence would also be contrary to the current regulations.  The final regulations, section 1.267(f)-1, Income Tax Regs., adopt the "immediately after" test of the consolidated return regulations that respondent contends were not part of the 1984 temporary regulation at issue in this case.  Sections 1.267(f)-1(b)(1) and 1.1502-13(b)(1)(i), Income Tax Regs., provide:

§ 1.267(f)-1.  Controlled groups.--* * *

*     *     *     *     *     *     *

(b) <u>Definitions and operating rules</u>.  The definitions in § 1.1502-13(b) and the operating rules of § 1.1502-13(j) apply under this section with appropriate adjustments, including the following:

(1) <u>Intercompany sale</u>.  An intercompany sale is a sale, exchange, or other transfer of property between members of a controlled group, if it would be an

> intercompany transaction under the principles of §
> 1.1502-13, determined by treating the references to a
> consolidated group as references to a controlled group
> and by disregarding whether any of the members join in
> filing consolidated returns.  [Emphasis added.]

> § 1.1502-13.  Intercompany transactions.--

>    *    *    *    *    *    *    *

> (b)  Definitions.  For purposes of this section--

> (1)  Intercompany transactions--(i) In general.
> An intercompany transaction is a transaction between
> corporations that are members of the same consolidated
> group immediately after the transaction.  S is the
> member transferring property or providing services, and
> B is the member receiving the property or services.
> Intercompany transactions include--

>> (A) S's sale of property (or other
>> transfer, such as an exchange or
>> contribution) to B, whether or not gain or
>> loss is recognized;  [Emphasis added.]

Our reading of the 1984 temporary regulation and the nonapplicability of the binding commitment cases is consistent with the position finally taken by respondent in section 1.267(f)-1, Income Tax Regs.[32]

For the foregoing reasons, we hold that MGM is not prohibited from deducting the loss realized on its March 25, 1986, sale of UA stock to Tracinda by virtue of the application

---

[32]Respondent argues that sec. 1.267(f)-1(h), Income Tax Regs., would apply if this case were governed by the final regulations.  That section is an anti-avoidance rule intended to apply only to transactions structured with a principal purpose of avoiding the purpose of sec. 267.  However, respondent has stipulated that petitioners were unaware of the loss when they decided on the form of the transaction.

of section 267(f).  It follows, for the same reasons, that Tracinda is not entitled to increase its basis in the UA shares by the amount of the UA Loss.[33]

<u>An appropriate order will be issued (1) granting TBS' motion for partial summary judgment, (2) granting Tracinda's motion for partial summary judgment as to the section 311 issue and denying it as to the section 267 issue, and (3) denying respondent's motion for summary judgment</u>.

---

[33]In regard to TBS, respondent's notice of deficiency provides further grounds for the disallowance of the UA Loss. Respondent contends that the capital loss carryover, which in part is made up of the UA Loss, is not permitted under secs. 269, 382, and 383.  Neither the parties' motions nor this opinion addresses these issues.