T.C. Memo. 2014-5

UNITED STATES TAX COURT

GATEWAY HOTEL PARTNERS, LLC, GATEWAY INTEREST
ACQUISITION CORP., TAX MATTERS PARTNER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 19182-07.                      Filed January 9, 2014.

Philip Karter, Dustin M. Covello, and Herbert Odell, for participants.

Dana E. Hundrieser and Lawrence C. Letkewicz, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, Judge:  The issues in this case arise out of the financing and

redevelopment of the former Statler and Lennox Hotels, two historic properties in

downtown St. Louis, Missouri.  Respondent issued a notice of final partnership

administrative adjustment (FPAA) for 2002 and 2003 (years at issue) under

[*2] section 6223(a)[1] to Gateway Hotel Partners L.L.C.'s (GHP) former tax matters partner. In the FPAA, respondent made certain adjustments to the income, expense, and deduction items GHP reported on Forms 1065, U.S. Return of Partnership Income, and imposed accuracy-related penalties under section 6662. GHP's former tax matters partner filed on GHP's behalf a petition for redetermination of partnership items.

The parties have settled several issues; however, there remain three issues for decision. The principal issue is whether GHP must recognize $18,455,000[2] of income from three transfers it made of certain Missouri Historic Preservation Tax Credits (MHTCs) in 2002. The answer turns on whether the transfers represented partnership distributions or taxable sales. We hold that two of the transfers were properly characterized as partnership distributions. However, a portion of the third transfer produced a taxable sale, and we sustain respondent's determination with respect to that portion. The second issue is whether GHP must include in income the return of $3,088,000 that it had previously contributed to a fund established in connection with the hotel project. We hold the return is not

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]All amounts are rounded to the nearest dollar.

[*3] includible in income.  The final issue is whether GHP is liable for the accuracy-related penalty for 2002 on the portion of any underpayment resulting from GHP's purported sale of the MHTCs.  We sustain the accuracy-related penalty resulting from the underpayment attributable to the nondistribution portion of the third transfer.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.  The stipulation of facts, the supplemental stipulation of facts, and the attached exhibits are incorporated by this reference.

I.  Hotel Project Background

In the late 1990s the City of St. Louis sought to spur the private development of a 1,000 room hotel project near its downtown convention center.  A major aspect of the City's plan was to encourage the rehabilitation of the historic Statler and Lennox Hotels and the construction of complimentary facilities adjacent to the convention center (collectively, hotel project).  Financing for the hotel project was expected to come from public sources, including tax increment financing, revenue bonds, HUD grants, Federal and State tax-credit equity, and private funding.

[*4] II. <u>Hotel Project Participants</u>

    A. <u>Owner</u>

GHP was organized to own, develop, construct, and operate the rehabilitation portion of the hotel project.[3] GHP elected partnership treatment for Federal tax purposes, and its principal place of business was in Missouri when the petition was filed. At all relevant times, Washington Avenue Historic Developer (WAHD), a Missouri limited liability company, and Housing Horizons, LLC (HH), a Texas limited liability company, were GHP's members. At all relevant times, GHP's profits and losses were allocated 1% to WAHD and 99% to HH under GHP's amended and restated operating agreement (GHP amended operating agreement).

    B. <u>Developer</u>

WAHD was engaged by GHP to perform on its behalf development services in connection with the hotel project. It was responsible for all the day-to-day operations of GHP, including procuring hotel project financing and managing the various aspects of the development and construction of the hotel project. WAHD

---

[3]A related entity, Gateway Tower Partners, L.L.C., was organized to construct and own a new hotel tower intended to accompany the historic rehabilitation. The aspects of the hotel project that concern this entity are not germane to this case.

[*5] was GHP's managing member and tax matters partner and held a 30% membership interest in GHP. WAHD elected partnership treatment for Federal tax purposes.

WAHD was majority owned and controlled by Historic Restoration, Inc. (HRI). HRI was WAHD's managing member. HRI was a real estate developer, engaged in adaptive reuse of historic structures, among other real estate activities, and was based in New Orleans, Louisiana. HRI elected S corporation treatment for Federal tax purposes.

### C. Investor

HH was a passive investor in the hotel project and held a 70% membership interest in GHP. HH was majority owned and controlled by Kimberly-Clark Corp. (KC), a Delaware corporation. HH and KC (collectively, participating partners) elected to participate in these proceedings pursuant to section 6226(c)(2) and Rule 245(b).

## III. MHTCs as a Source of Financing

One of the sources of financing HRI planned to use to finance the hotel project was MHTCs it expected to receive from the completion of the hotel project. The MHTC program started in 1998. The MHTC program's purpose is to aid in the redevelopment of historic structures in the State of Missouri. Under the

**[*6]** program, any person, firm, partnership, trust, estate, or corporation incurring qualifying costs and expenses for the rehabilitation of eligible property is entitled to MHTCs. The amount of MHTCs available is 25% of the total costs and expenses of the rehabilitation. MHTCs were not earned or issued until the completion of the relevant rehabilitation project. Taxpayers having earned MHTCs could transfer, sell, or assign them.

A taxpayer desiring to receive MHTCs must apply to the Missouri Department of Economic Development (MDED) for such credits through a multistep application procedure. In connection with the hotel project, GHP applied for entrance into the MHTC program. In December 1999 the MDED granted preliminary approval of GHP's application. In December 2002 it granted final approval.

IV. The Bridge Loan Financing

The MHTCs HRI expected to use as a source of financing were not available until completion of the hotel project. To include the MHTCs as a source of funds at the beginning of the hotel project, bridge financing was required. The Missouri Development Finance Board (MDFB) was approached about making a $18,455,000 bridge loan to HRI in connection with the hotel project. The MDFB is an agency created by statute as a body corporate and politic. Its mission is to

**[*7]** assist infrastructure and economic development projects in Missouri by providing financial support for otherwise unfeasible projects that private lenders are unwilling to finance. The MDFB is self-funded, and the funds that it lends for development projects typically come from the issuance of revenue bonds.

A. Due Diligence

The MDFB undertook due diligence to determine HRI's creditworthiness. In particular, it sent several representatives to HRI's New Orleans, Louisiana, headquarters to review its financial records. Ultimately, the MDFB satisfied itself that HRI had sufficient potential assets in the event of a default on the bridge loan. The MDFB viewed HRI as a more reliable borrower than GHP because GHP was a single-project company whose assets were limited to the hotel project, whereas HRI was not.

B. Authority to Enter into the Bridge Loan Agreement

The MDFB passed a board resolution authorizing its participation in the hotel project and authorizing it to make the bridge loan to HRI. HRI, WAHD, and GHP all executed closing certificates for the hotel project financing containing certain resolutions to enter into the bridge loan agreement. The HRI closing certificate contains a resolution under which HRI resolves to "enter into" the bridge loan agreement on "its own behalf", "on behalf of" WAHD, and "on behalf

**[*8]** of" GHP. The WAHD closing certificate contains a resolution under which WAHD resolves to "enter into" the bridge loan agreement "on behalf of" GHP. Finally, the GHP closing certificate contains a resolution under which GHP resolves to "enter into" the bridge loan agreement.

    C.  <u>The Bridge Loan Agreement</u>

In December 2000 HRI entered into the bridge loan agreement with the MDFB. The bridge loan agreement designated HRI as the "borrower" of the bridge loan. The bridge loan agreement recitals reflect that HRI applied for the bridge loan for the purpose of providing funds to WAHD to make a capital contribution to GHP. The bridge loan agreement reflects that the bridge loan matured in December 2005 or upon the final payment for the purchase of MHTCs under a certain tax credit purchase agreement (discussed <u>infra</u>). It also reflects that the principal amount of the bridge loan bore interest at an annual rate of 9.5%. It further reflects that HRI was required to deposit with the MDFB $3,285,000 to prepay two years of interest on the bridge loan.

To induce the MDFB to make the bridge loan, HRI made various nonmonetary representations, covenants, and warranties on behalf of GHP and WAHD. For example, HRI represented and warranted on GHP's and WAHD's behalf that: (1) their assets and interests in the hotel project were free and clear of

[*9] all liens and encumbrances; (2) they did not have knowledge of pending litigation against them; (3) they would use the bridge loan proceeds only as specified in the bridge loan agreement; (4) they were not in default; (5) they had not incurred any "material" liabilities and had not entered into any "material" transactions; and (6) they did not have knowledge of certain environmental issues concerning the hotel project properties.

HRI executed the bridge loan agreement as the "borrower". On a signature page for acknowledging and approving the form of the bridge loan agreement, a representative of HRI signed the bridge loan agreement on behalf of WAHD and GHP. The MDFB intended HRI to be the sole borrower and be solely liable for repayment of the bridge loan in the event of default.

V. Contributions of the Bridge Loan Proceeds

Under the first amendment to WAHD's operating agreement (WAHD amended operating agreement), HRI agreed to make a capital contribution of the bridge loan proceeds to WAHD (HRI contribution) concurrently with the funding of the bridge loan, and WAHD was in turn required to contribute those proceeds to GHP. HRI was entitled to a 9.5% preferred return on the HRI contribution from the date of the contribution until an extraordinary event distribution, i.e., a distribution received by WAHD from GHP because of an extraordinary event as

[*10] defined in the GHP amended operating agreement. Upon an extraordinary event, HRI was entitled to a preferred return of capital with a distribution of net cashflow or, alternatively, a distribution of property having an agreed fair market value equal to HRI's contribution plus any accrued but unpaid preferred return thereon through the date of such return of capital.

Similarly, under the GHP amended and restated operating agreement (GHP amended operating agreement), WAHD was to immediately use the bridge loan proceeds contributed by HRI to make an $18,455,000 capital contribution to GHP (WAHD contribution). Under section 4.3 of the GHP amended operating agreement, WAHD was entitled to an annual preferred return of 9.5% on the WAHD contribution, payable out of operating profits to the extent of available cashflow from the date of contribution until the occurrence of an "extraordinary event".

The GHP amended operating agreement defines an "extraordinary event" as the creation of new property by GHP, other than the completion of the project or any portion thereof, the creation of which is subject to the entrepreneurial risks of development, construction, and completion, any distribution with respect to which occurs more than 24 months after the date the WAHD contribution is made. The definition of "extraordinary event" includes the issuance of MHTCs.

[*11] Upon the occurrence of an "extraordinary event," WAHD was entitled to a preferred return of capital from GHP under section 4.3 of the GHP amended operating agreement which provides in pertinent part:

> Upon the occurrence of an Extraordinary Event, WAHD shall be entitled to a preferential return of capital (WAHD's preferred return of capital right) in the form of a distribution of available Cash Flow (subject to the provisions of the Master indenture), or, alternatively, in the sole discretion of * * * [HH], a distribution of property having an agreed fair market value equal to * * * [the WAHD contribution], plus any accrued but unpaid Preferred Return thereon through the date of such return of capital.

## VI. Securing Repayment of the Bridge Loan

The MDFB required HRI to provide certain security for the bridge loan. In this connection, the MDFB and HRI executed a collateral assignment agreement (HRI collateral assignment agreement I) under which HRI collaterally assigned to the MDFB and granted it a security interest in all beneficial rights HRI had with respect to its membership interest in WAHD. HRI also executed a collateral assignment agreement under which HRI assigned and granted the MDFB a security interest in all rights HRI might have from the sale of the MHTCs it expected to receive as a preferred return of capital (discussed infra).

Similarly, HRI required WAHD to provide it with certain security for the HRI contribution. To this end, HRI and WAHD executed a collateral assignment

[*12] agreement (WAHD collateral assignment) and recorded a financing statement with the State of Missouri. Through the WAHD collateral assignment and the corresponding financing statement, WAHD assigned to HRI and granted HRI a security interest in all its benefits, payments, and other rights under the GHP amended operating agreement and under the master credit and disbursement indenture (master indenture), including rights to insurance proceeds relating to the issuance or nonissuance of MHTCs expected to be generated by the completion of the hotel project.

The WAHD collateral assignment contained an "intervention" section with certain terms and provisions to which HH agreed. In paragraph "F" of the "intervention" HH agreed to waive certain rights relating to the WAHD contribution as follows:

> Notwithstanding any other provisions of the * * * [GHP amended operating agreement] to the contrary, only Assignor [WAHD] shall be entitled to the rights provided for in Section 4.3 thereof, and Housing Horizons [HH] hereby waives any interest it may have in such rights and covenants and agrees that if and when such rights become due and owing, such amounts due shall be distributable to and be the sole property of Assignor [WAHD] or its pledgees, free and clear of any encumbrances of the * * * [GHP amended operating agreement], and Housing Horizons [HH] waives any right or claims it may have with respect to such amounts due, including any rights created by operation of law or by the * * * [GHP amended operating agreement].

**[\*13]**  The MDFB also recorded with the State of Missouri a financing statement (GHP financing statement) listing GHP as the "debtor" and the MDFB as the "secured party".  The financing statement reflects that it covers the following types of property:  all benefits, payments, and other rights GHP might have under any and all insurance policies relating to the issuance or nonissuance of MHTCs as a result of damage to or destruction of the hotel project.  The record does not reflect that GHP executed a collateral assignment agreement or security agreement corresponding to the GHP financing statement.

VII.  Plan and Agreement To Sell Expected MHTCs

HRI anticipated that GHP would earn a certain amount of MHTCs from the hotel project and distribute those MHTCs as a preferred return of capital to WAHD, who HRI expected would make a further distribution of MHTCs to it as a preferred return of capital.  In anticipation of receiving the credits, HRI entered into a tax credit purchase agreement with Firstar Community Development Corp. (Firstar CDC).[4]  Under the terms of the tax credit purchase agreement, Firstar CDC

---

[4]In October 2000 this entity became a subsidiary of U.S. Bancorp and changed its name to U.S. Bancorp Community Development Corp.  However, the distinction between these entities in their pre- and post-acquisition forms is irrelevant for purposes of this case. Therefore, for convenience, the designation "Firstar CDC" will be used to refer to this entity both before and after it was acquired by U.S. Bancorp.

[*14] agreed to purchase up to a certain amount of MHTCs expected to be generated by the hotel project for 82 cents per $1 of credit. When the tax credit purchase agreement was executed, HRI assigned its right to the payment of the purchase price for the MHTCs to the MDFB.

VIII. Relevant Aspects of the Hotel Project Development and Construction

A. Development Agreement

WAHD agreed to provide development services for the hotel project under a development agreement that it entered into with GHP. The development services included identifying and negotiating financing for the hotel project, overseeing construction services, and other matters related to the completion of the hotel project. Under the development agreement, GHP promised to pay WAHD for its services a development fee not to exceed $9,265,000.

The development fee was to be paid in installments. On the hotel project closing date, GHP was required to pay the first installment of $3,088,340 of the deferred developer fee to WAHD and deposit $3,454,000 into the deferred-development-fees fund established by the master trustee of the master indenture. And upon receipt of certain Brownfield tax credits (a tax incentive for environmental remediation), GHP was required to deposit an additional $2,723,000 in the deferred-development-fees fund.

**[\*15]**  The installments from the deferred-development-fees fund were to be paid in the following manner:  the first installment was to be paid upon completion of the Lennox Hotel rehabilitation, the second installment upon the commencement-of-operations date of the hotel project, and the final installment upon the achievement of a certain debt service coverage ratio for one full fiscal year after the commencement-of-operations date.

The master indenture provided that the deferred portion of the funds in the deferred-development-fees fund could be used by the master trustee to fund certain deficits including GHP operating deficits.  Under the GHP amended operating agreement, WAHD promised to fund GHP's operating deficits by transferring up to 25% of certain fees paid to it by GHP, including the deferred development fees (operating deficit guaranty).  The GHP amended operating agreement provides that any transfer from the deferred-development-fees fund shall be treated as a deemed payment by WAHD to GHP in satisfaction of its operating deficit guaranty.  The GHP amended operating agreement instructs that such a deemed payment shall not be treated as a loan or capital contribution to GHP, and the deemed payment of such amounts shall not affect the membership interests or allocations of GHP's profits and losses to its members.

**[\*16]**  B.  <u>Master Credit and Disbursement Indenture</u>

GHP entered into the master indenture to incur certain indebtedness, to pool credit resources, and to promote the efficient financing of the hotel project.  State Street Bank & Trust Co. of Missouri, N.A., was named master trustee under the master indenture.[5]  Under the master indenture, GHP along with other hotel project participants were required to make certain representations and warranties.  It also required financing from all sources, including the bridge loan proceeds, to be deposited with the master trustee in a project fund that contained various accounts.  The master trustee was to disburse the funds in accordance with the hotel project budget and other specified terms and conditions contained in the master indenture, including certain restrictions and priorities regarding the use of project funds.

The master indenture required GHP to immediately pay $3,285,000 of the deposited bridge loan proceeds to WAHD as a prepaid preferred return on the WAHD contribution that WAHD agreed to make to GHP.  WAHD was to pay the same amount to HRI as a prepaid preferred return on the HRI contribution that HRI agreed to make to WAHD.  HRI agreed to collaterally pledge its rights with

---

[5]In 2001 State Street Bank & Trust Co. of Missouri, N.A., was acquired by UMB Bank, which became the master trustee.  The distinction between these two entities is irrelevant for purposes of this case.  Therefore, both are referred to herein as the master trustee.

[*17] respect to such payments to secure its obligations to the MDFB, including its obligation to prepay two years of interest on the bridge loan.  In satisfaction of the foregoing series of obligations, the master trustee was to transfer $3,285,000 of the bridge loan proceeds to the MDFB at closing as prepaid interest from HRI on the bridge loan.

Under the master indenture, GHP was required to (and in fact did) obtain insurance to protect the hotel project against financial losses, including losses of Federal and State tax credit equity, caused by property damage or casualty.

IX.  Operative Events Occurring on or after Closing of the Hotel Project

A.  Disbursement of the Bridge Loan Proceeds and Prepayment of Interest and Fees on the Bridge Loan

The $18,455,000 of bridge loan proceeds was transferred to and deposited directly with the master trustee of the master indenture.  The direct transfer of the bridge loan proceeds to the master trustee's account was consistent with the MDFB's normal procedures for loan closings.  The master trustee used the deposited bridge loan proceeds to prepay the interest required under the bridge loan agreement.

**[*18]** B. <u>Transfer From the Deferred-Development-Fees Fund to GHP To Fund Operating Deficits</u>

As of February 13, 2003, GHP had an operating deficit. Shortly thereafter, $3,088,000 of the unpaid deferred development fee was contributed back to GHP to fund its operating deficits in accordance with the master indenture. GHP treated these draws as an equity contribution from WAHD for accounting purposes. Likewise, GHP reported the transfer as an equity contribution by WAHD on its 2003 tax return.

C. <u>Receipt and Transfer of Hotel Project MHTCs</u>

GHP qualified for and received the MHTCs on two occasions in 2002. The MDED transferred $6,178,656 of MHTCs (Lennox MHTCs) to GHP on June 19, 2002, after GHP completed the Lennox Hotel rehabilitation. Per HRI's instructions, the MDED transferred those MHTCs first to HRI (as WAHD's assignee) and then to Firstar CDC in accordance with the tax credit purchase agreement.[6]

_____

[6]HRI sent the MDED a letter in April 2002 instructing it to transfer these MHTCs first from GHP to HRI (as WAHD's assignee) then from HRI to Firstar CDC. Contrary to these instructions, on June 14, 2002, the MDED inadvertently transferred the MHTCs directly from GHP to Firstar CDC (i.e., omitting HRI). When this occurred, the MDED was contacted to request that it reissue and transfer the MHTCs correctly as instructed. Consequently, on June 19, 2002, the MDED voided the June 14 transfer and documented new transfers consistent with

(continued...)

[*19] The completion of the Statler Hotel rehabilitation caused the hotel project to incur more MHTC-eligible expenses than anticipated and thus earn more MHTCs than had been initially anticipated. On December 16, 2002, in anticipation of GHP's receiving MHTCs from the Statler Hotel rehabilitation, HRI (on GHP's behalf) instructed the MDED in certain Missouri Forms HTC-T and cover letters accompanying those forms to transfer Statler-related MHTCs with a credit value of $13,388,503 from GHP to HRI in satisfaction of WAHD's and HRI's respective preferred equity and instructed that any excess MHTCs be transferred on GHP's behalf to Firstar CDC. On December 30, 2002, the MDED issued Statler-related MHTCs to GHP entitling their holder to a tax credit equal to $17,620,978. That same day, consistent with HRI's December 16 instructions, the MDED transferred $13,388,503 of MHTCs (Statler tranche 1 MHTCs) from GHP to HRI (as WAHD's assignee) and then to Firstar CDC. Also pursuant to HRI's December 16 instructions, the MDED transferred the remaining $4,232,475 of Statler-related MHTCs (Statler tranche 2 MHTCs) from GHP to Firstar CDC. In

_____

[6](...continued)
HRI's instructions, i.e., from Gateway to HRI (as WAHD's assignee) to Firstar CDC. Because the June 14 transfer was voided within the taxable year, under the rescission doctrine that transfer had no effect for tax purposes. See Rev. Rul. 80-58, 1980-1 C.B. 181.

[*20] exchange for the Statler tranche 2 MHTCs, Firstar CDC transferred certain proceeds to the MDFB, which it applied against the bridge loan balance.

On January 8, 2003, an accounting firm representing GHP notified the MDED that the amount of MHTCs that GHP requested to be transferred on the relevant Missouri Forms HTC-T was incorrect. The accounting firm requested that the MDED void the initial December 30, 2002, transfer of the Statler tranche 1 MHTCs and the Statler tranche 2 MHTCs and retransfer GHP's MHTCs. To that end, it provided the MDED with new Missouri Forms HTC-T requesting the transfer of MHTCs with a credit value of $16,327,443 from GHP to HRI and then from HRI to Firstar CDC, and requesting the transfer of MHTCs with a credit value of $1,293,535 (the remaining MHTCs) from GHP to Firstar CDC. It also requested that the MDED change its records to reflect the new requested transfer amounts of MHTCs. The MDED accepted the new Missouri Forms HTC-T and changed its transfer records accordingly.

D. Repayment of the Bridge Loan

The bridge loan was repaid in 2002 with proceeds from the sale of certain MHTCs to Firstar CDC.

[*21] X. Reporting Positions

GHP filed a Form 1065 for 2000. The Form 1065 does not reflect that GHP received a capital contribution from WAHD equal to the amount of the bridge loan proceeds. Additionally, GHP's financial statements for 2000 do not reflect such a capital contribution either. The record does not reflect that HRI reported making an $18,455,000 capital contribution to WAHD on its financial statements or tax return. Similarly, the record does not reflect that WAHD reported making an $18,455,000 capital contribution to GHP on its financial statements or tax return.

GHP filed a Form 1065 for 2002. GHP's Form 1065 for 2002 and its financial statements for that year do not reflect that it made a distribution of MHTCs in any amount to WAHD. Additionally, WAHD's Form 1065 for 2002 does not reflect it received a distribution of MHTCs from GHP or that it made a distribution of MHTCs to HRI. Likewise, HRI's financial statements and its Federal tax return for 2002 do not reflect that it received a distribution of MHTCs from WAHD.

GHP did not report on any Federal tax return that it had income from its transfers of the Lennox MHTCs, the Statler tranche 1 MHTCs, and $2,938,940

[*22] (credit value) of the Statler tranche 2 MHTCs.[7] GHP also did not report as income on any Federal tax return its receipt of the $3,088,000 transferred to it from the deferred-development-fees fund.

## XI. Tax Opinion

The law firm of Baker & McKenzie provided a tax opinion regarding whether a distribution of MHTCs by GHP to WAHD would be respected as a distribution to a recipient partner or recharacterized as some form of taxable transaction. The tax opinion was rendered before GHP made any transfers of the MHTCs it received from the hotel project. It does not address GHP's attempt to rescind the initial December 30, 2002, transfer of the Statler tranche 2 MHTCs or the treatment of their transfer to Firstar CDC.

## XII. The FPAA

Respondent issued WAHD, GHP's tax matters partner, an FPAA covering 2002 and 2003. The FPAA determined that GHP failed to report $18,455,000 of income from its transfers of the Lennox MHTCs, the Statler tranche 1 MHTCs, and the Statler tranche 2 MHTCs. Respondent also determined that GHP failed to

---

[7]Consistent with its view that the initial transfer of the Statler tranche 2 MHTCs was ineffective, GHP took the position that it sold the Statler tranche 2 MHTCs having a credit value equal to $1,293,535 and reported on its return the corresponding sale proceeds totaling $1,060,699.

[*23] report as income $3,088,000 transferred to it from the deferred-development-fees fund. WAHD filed a petition on behalf of GHP seeking a redetermination of the adjustments in the FPAA.

OPINION

We must decide whether GHP must include in income $18,455,000 of gain from certain transfers it made of MHTCs. We also must decide whether GHP must include in income money transferred to it from the deferred-development-fees fund. Finally, we must decide whether GHP is liable for the accuracy-related penalty. We first address the burden of proof.

I. Burden of Proof

The taxpayer generally bears the burden of proving the Commissioner's determinations are erroneous. Rule 142(a). The burden of proof may shift to the Commissioner if the taxpayer satisfies certain conditions. Sec. 7491(a). Participating partners have not argued that section 7491(a) applies nor established their compliance with its requirements. Therefore, the burden of proof remains on participating partners. See Rule 142(a).

II. Tax Consequences of GHP's MHTCs Transfers

Respondent contends that GHP sold the Lennox MHTCs, the Statler tranche 1 MHTCs, and the Statler tranche 2 MHTCs to Firstar CDC and failed to report

[*24] $18,455,000 of taxable gain from the sales. Participating partners contend that GHP's transfer of the relevant MHTCs should be respected as a nontaxable partnership distribution under section 731(b). We first address the treatment of GHP's transfers of the Lennox MHTCs and the Statler tranche 1 MHTCs and then turn to the treatment of the Statler tranche 2 MHTCs.

A. Lennox MHTCs and Statler Tranche 1 MHTCs

Participating partners contend that the MDFB made the bridge loan to HRI, that HRI contributed the bridge loan proceeds to WAHD in exchange for preferred-equity rights, and that WAHD contributed those same proceeds to GHP in exchange for preferred-equity rights. They further contend that GHP's transfers of the Lennox MHTCs and the Statler tranche 1 MHTCs to HRI (as WAHD's assignee) were distributions in redemption of WAHD's preferred equity. On this basis, they take the position that GHP's transfer of MHTCs is properly characterized as a distribution by a partnership to a partner and thus assert that no gain or loss is recognizable on the transfers under section 731(b).

Respondent contends that the transfers of MHTCs to HRI (as WAHD's assignee) did not redeem WAHD's preferred equity because WAHD never made the relevant preferred-equity contribution. Respondent argues that even if GHP's transfer of the Lennox and Statler tranche 1 MHTCs were made in redemption of

**[*25]** WAHD's preferred equity, the transactions should be recast as taxable sales under the substance over form doctrine, the step transaction doctrine, or disguised sale concepts.

Section 731(b) provides: "No gain or loss shall be recognized to a partnership on a distribution to a partner of property, including money." For reasons elucidated below, we agree with participating partners that GHP's transfers of the Lennox MHTCs and the Statler tranche 1 MHTCs are properly characterized as distributions in redemption of WAHD's preferred equity, and we disagree with respondent that the relevant transactions should be recast as taxable sales. Accordingly, we hold that under section 731(b) GHP was not required to recognize any gain or loss on the transfers of the Lennox MHTCs and Statler tranche 1 MHTCs. We now turn to the findings and reasoning on which we base our holding.

1. Whether GHP's Transfers of the Lennox MHTCs and the Statler
   Tranche 1 MHTCs Were Preferred-Equity Distributions

Respondent argues that GHP's transfers of the Lennox MHTCs and the Statler tranche 1 MHTCs were not a redemption of WAHD's preferred equity for two main reasons. First, respondent contends that the transfers could not have been distributions in redemption of WAHD's preferred equity because the bridge

**[*26]** loan was made directly to GHP, thus precluding WAHD from having made the capital contribution that participating partners contend entitled it to a preferred-equity distribution of the relevant MHTCs. Second, respondent contends that irrespective of the borrower's identity under the bridge loan, WAHD never actually contributed the bridge loan proceeds to GHP since they were transferred directly from the MDFB to GHP.

We agree with respondent that if the bridge loan was made to GHP then HRI could not have made the relevant capital contribution that would entitle it to a preferred-equity distribution of the Lennox MHTCs and the Statler tranche 1 MHTCs. However, we disagree with respondent's second contention that the MDFB's transfer of the bridge loan proceeds directly to GHP precludes WAHD from having made a capital contribution of those same proceeds to GHP, and we dispense with it now.

HRI was obligated under its operating agreement to contribute the bridge loan proceeds to WAHD, and WAHD was obligated under its operating agreement to contribute those same proceeds to GHP. To obviate the need for three separate transfers, MDFB dispensed the proceeds directly to GHP. If HRI was the borrower under the bridge loan agreement, we find the single transfer in substance

[*27] resulted in deemed capital contributions from HRI to WAHD and then from WAHD to GHP.

Thus, whether WAHD made a capital contribution entitling it to a preferred-equity distribution of the Lennox MHTCs and the Statler tranche 1 MHTCs depends on whether HRI or GHP was the borrower under the bridge loan. Respondent argues that the form and substance of the bridge loan reflect that it was made solely to GHP. Participating partners argue the form and substance of the bridge loan reveal that HRI was the true borrower.

a. Form of the Bridge Loan

State law determines the legal interests and rights upon which Federal income tax consequences depend. United States v. Nat'l Bank of Commerce, 472 U.S. 713, 722 (1985); Morgan v. Commissioner, 309 U.S. 78, 80-81 (1940). Under Missouri law, the obligor of a loan is generally the party designated as the borrower in the governing loan instruments. See generally Ethridge v. TierOne Bank, 226 S.W.3d 127, 131-132 (Mo. 2007). HRI was the designated borrower in the bridge loan agreement and executed it as such. Moreover, the bridge loan agreement does not reference any other person as the borrower.

Respondent argues for two main reasons that despite HRI's designation as the "borrower" under the bridge loan agreement, the form of the transaction

[*28] reflects that GHP was the borrower. First, respondent contends that GHP was the borrower because HRI entered into the bridge loan agreement solely in its representative capacity "on behalf of GHP". We agree with respondent that if GHP entered into the bridge loan solely in a representative capacity on behalf of GHP, that would lend support to respondent's claim that the form of the bridge loan transaction reflects GHP was the borrower. However, the record does not reflect that HRI entered into the bridge loan agreement or served as the borrower solely in a representative capacity on behalf of GHP.

As support for the contention that HRI acted solely in a representative capacity, respondent points to certain certified resolutions of GHP, WAHD, and HRI. Those resolutions together grant HRI authority to "enter into" the bridge loan agreement on "its own behalf" and "on behalf of" WAHD and GHP. Respondent argues that these resolutions show that HRI acted as GHP's agent in borrowing the bridge loan proceeds and thus bound GHP to repay the bridge loan.

We disagree. It does not necessarily follow from the resolutions that HRI borrowed the funds under the bridge loan or entered into the bridge loan agreement solely in its representative capacity. All the resolutions show is that HRI had authority to enter into the bridge loan agreement on its own behalf and on behalf of GHP; they do not show how HRI exercised that authority. Accordingly,

[*29] we look to the bridge loan agreement to determine the manner and capacity in which HRI exercised its authority to enter into the bridge loan agreement.

The bridge loan agreement does not reflect that HRI acted as GHP's agent (or solely in a representative capacity) in borrowing the proceeds under the bridge loan. As previously mentioned, the bridge loan agreement designates HRI as the unequivocal "borrower". And HRI signed its name under the "borrower" signature block in its individual capacity, not "on behalf of" GHP or as GHP's "agent".

Instead, the bridge loan agreement reveals that HRI exercised its authority to enter into the bridge loan agreement on behalf of GHP only with respect to certain warranties, representations, and covenants. None of the representations, covenants, or warranties obligated GHP to repay the bridge loan principal or interest accruing thereon. So while HRI did have authority to enter into the bridge loan agreement on behalf of GHP, the bridge loan agreement establishes that HRI did not exercise that authority so as to bind GHP to repay the bridge loan.

Respondent argues that GHP's approval of the form of the bridge loan agreement shows that HRI entered into the bridge loan agreement on behalf of GHP. While it is true that GHP (as well as WAHD) executed the bridge loan agreement in addition to HRI, the bridge loan agreement reflects that GHP

[*30] executed it only for purposes of "approv[ing] its form". Such approval in and of itself does not obligate GHP to repay the bridge loan principal or interest. Cf. Ethridge, 226 S.W.3d at 131-132 (wife's signature underneath the signature block on a deed of trust does not change the deed's plain description of the husband as the sole borrower).

Respondent secondly contends that the form of the bridge loan transaction reflects that GHP was the bridge loan borrower because GHP obligated itself to repay the bridge loan by transferring its MHTC rights to the MDFB through the WAHD collateral assignment agreement (including the attached intervention by HH) and the GHP financing statement. The record does not support the predicate for respondent's claim.

GHP did not execute a collateral assignment agreement or otherwise assign its MHTC rights. Under section 4.3 of the GHP amended operating agreement, WAHD was entitled to a preferred return of capital upon the issuance of the MHTCs "in the form of a distribution of available cash flow, * * * or, alternatively, in the sole discretion of * * * [HH], a distribution of property having an agreed fair market value equal to the * * * [WAHD contribution] amount". Accordingly, HH could prevent a transfer of the MHTCs under the GHP amended operating agreement. Respondent argues, however, that HH waived this right

**[\*31]** under paragraph F of the intervention attached to the WAHD collateral assignment. Participating partners dispute that HH waived the right. The parties' dispute over the meaning of paragraph F of the intervention presents an issue of contract interpretation.

The WAHD collateral assignment agreement and the attached intervention are governed by Missouri law. "The cardinal principle of contract interpretation is to ascertain the intention of the parties and to give effect to that intent." Dunn Indus. Group, Inc. v. City of Sugar Creek, 112 S.W.3d 421, 428 (Mo. 2003) (per curiam). In interpreting a contract, we read the contract as a whole and give its terms their "plain, ordinary and usual meaning." Id. We also construe each of the contract's terms to avoid rendering the other terms meaningless, and we prefer a "construction that attributes a reasonable meaning to all the provisions of the agreement * * * to one that leaves some of the provisions without function or sense." Id. The parties' intent is determined on the basis of language in the contract alone unless the contract is ambiguous. Baum v. Helget Gas Prods., Inc., 440 F.3d 1019, 1023 (8th Cir. 2006) (applying Missouri law). An ambiguity is not created simply because the parties disagree about the contract's interpretation. Id. The test, rather, is "'whether the disputed language, in the context of the entire agreement, is reasonably susceptible of more than one construction giving the

[*32] words their plain and ordinary meaning as understood by a reasonable average person.'" Id. (quoting Speedie Food Mart, Inc. v. Taylor, 809 S.W.2d 126, 129 (Mo. Ct. App. 1991).

With these principles in mind, we turn to paragraph F of the intervention. Paragraph F provides:

> Notwithstanding any other provisions of the * * * [GHP amended operating agreement] to the contrary, only Assignor [WAHD] shall be entitled to rights provided for in Section 4.3 thereof, and Housing Horizons [HH] hereby waives any interest it may have in such rights and covenants and agrees that if and when such rights become due and owing, such amounts due shall be distributable to and be the sole property of Assignor [WAHD] or its pledgees, free and clear of any encumberances of the * * * [GHP amended operating agreement], and Housing Horizons [HH] waives any rights or claims it may have with respect to such amounts due, including any rights created by operation of law or by the * * * [GHP amended operating agreement].

The critical question is what are "the rights provided for in Section 4.3" of the GHP amended operating agreement to which paragraph F refers? Is it the preferred return right and the preferred return of capital right? HH's right to decide to satisfy WAHD's right to a preferred return of capital with a distribution from available cashflow or with a distribution of property, e.g., the MHTCs? Or both?

[*33] We think the WAHD collateral assignment agreement taken as a whole and in context unambiguously reflects that the "rights provided for in Section 4.3" means: (1) the preferred return right and (2) preferred return of capital right.[8] Paragraph F states that only WAHD shall be entitled to "the rights provided for in Section 4.3". Paragraph F goes on to provide that HH waives any interest it may have in "such rights" and agrees that if and when "such rights become due and owing, such amounts due shall be distributable to and be the sole property of WAHD". (Emphasis added.)

We think a plain reading of "such rights * * * due and owing" means rights that give rise to an obligation to make payment, i.e., of money or property. Our interpretation is bolstered by the phrase "such amounts due" modifying "such rights become due and owing". The modification indicates the "rights provided for in Section 4.3" are the kind that give rise to an obligation to make a payment of an amount. HH's discretionary right to decide how to satisfy WAHD's preferred return of capital right did not give rise to a payment obligation or any other obligation for that matter. It simply gave HH the right to decide the form of the payment obligation arising from the preferred return of capital right. Accordingly, we do not read paragraph F, as respondent urges, to remove HH's discretion to

_____

[8]For the relevant parts of "sec. 4.3" see supra p. 11.

**[\*34]** decide how to satisfy the preferred return of capital right. We therefore reject respondent's argument that the WAHD collateral assignment agreement effectively obligated GHP to repay the bridge loan.

Respondent also argues that GHP transferred its rights to receive the MHTCs to the MDFB through the GHP financing statement, thus demonstrating GHP was responsible for repaying the bridge loan. Again, we disagree. A financing statement's purpose is to give notice to a third party to make further inquiry as to specific collateral. In re Payless Cashways, Inc., 273 B.R. 789, 790 (Bankr. W.D. Mo. 2002). While a financing statement may in limited circumstances give rise to a security interest in a purported obligor's property, it generally does not. See Shelton v. Erwin, 472 F.2d 1118, 1120 (8th Cir. 1973); Centerre Bank Nat'l Ass'n v. Mo. Farmers Ass'n, Inc., 716 S.W.2d 336, 341 (Mo. Ct. App. 1986) ("A financing statement is merely evidence of the creation of a security interest and does not itself constitute a security agreement."). Rather, the creation of an enforceable security interest is created by a security agreement. See Centerre Bank Nat'l Ass'n, 716 S.W.2d at 341.

The record does not reflect that GHP executed any agreement specifically referred to as the "security agreement" or otherwise functioning as a "security agreement" that corresponds to the GHP financing statement. While a financing

**[*35]** statement may constitute a security agreement if certain requirements are met, we find that this financing statement does not.

A security agreement must contain granting language that conveys a security interest in the relevant property.  Shelton, 472 F.2d at 1120.  Listing covered collateral is insufficient to grant a security interest.  See Starman v. John Wolfe, Inc., 490 S.W.2d 377, 383-384 (Mo. Ct. App. 1973); see also In re Modafferi, 45 B.R. 370, 373 (Bankr. S.D.N.Y. 1985); Needle v. Lasco Indus., Inc., 89 Cal. Rptr. 593, 595-596 (Ct. App. 1970).  An examination of the GHP financing statement reveals that it merely describes covered collateral.  It does not contain language granting the MDFB a security interest in the covered collateral.  Accordingly, the GHP financing statement fails to convey to the MDFB a security interest in the covered property described in the GHP financing statement.

Another reason the financing statement fails to create a security interest is that it does not identify the obligation to be secured by the covered collateral.  A security interest provides an interest in collateral that secures payment or performance of an obligation.  Needle, 89 Cal. Rptr. at 596.  At a minimum, then, a security agreement must recite the obligation to be secured.  See In re Modafferi, 45 B.R. at 373-374; Needle, 89 Cal. Rptr. 593.  Here, nothing on the face of the

**[*36]** GHP financing statement indicates the obligation that the covered collateral is to secure.

Because the GHP financing statement does not constitute a security agreement, it failed to create a security interest in any of GHP's property. Respondent's argument that GHP transferred its rights to receive the MHTCs to the MDFB through the GHP financing statement is predicated on its having created a "security interest" in GHP's rights to the expected MHTCs in favor of the MDFB. As a result, respondent's argument fails.

In conclusion, we find that the form of the bridge loan transaction reflects that HRI, not GHP, was the borrower, and we do not find persuasive any of respondent's arguments to the contrary.

### b. Substance of the Bridge Loan

#### i. The Substance Over Form Doctrine

Respondent contends that even if the form of the bridge loan transaction reflects that HRI was the borrower, the substance of the transaction reveals that GHP, not HRI, was the true borrower. Participating partners dispute that GHP was the borrower in substance. It is well established that the tax consequences resulting from a transaction depend on the transaction's substance rather than its form. Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945) ("The

**[*37]** incidence of taxation depends upon the substance of a transaction.");

Gregory v. Helvering, 293 U.S. 465 (1935); Calumet Indus., Inc. v. Commissioner,

95 T.C. 257, 288 (1990) ("[T]he substance of the transaction is controlling, not the

form in which it is cast or described.").

A loan, in essence, involves a transaction whereby one person (the lender)

advances money to another (the borrower) for her promise to repay it upon such

terms as to time and rate of interest, or without interest, as the parties may agree.

See Welch v. Commissioner, 204 F.3d 1228, 1230 (9th Cir. 2000), aff'g T.C.

Memo. 1998-121. Accordingly, a borrower's essential obligation is to repay the

loan. Given this, we think a person bearing the economic risk of loss for loan

repayment strongly indicates that the person is the borrower in substance. As

discussed above, HRI's designation as "borrower" in the bridge loan agreement

and execution of the agreement in its individual capacity as such obligated HRI to

repay the bridge loan. This is consistent with both the MDFB's and HRI's view of

who the borrower was in the bridge loan transaction. The MDFB's top executive

Robert Miserez and general counsel, David Queen, credibly testified that the

MDFB, an unrelated third-party lender, intended to make the bridge loan to HRI,

not GHP, and looked to HRI, not GHP, for repayment. Likewise, HRI regarded

[*38] the repayment of the bridge loan as its obligation, according to the testimony of HRI's chief operating officer and president.

However, even though a party is legally obligated to repay a loan, it may not be the primary obligor if the lender is really looking to a secondary obligor for repayment. See, e.g., Selfe v. United States, 778 F.2d 769 (11th Cir. 1985); Plantation Patterns, Inc. v. Commissioner, 462 F.2d 712 (5th Cir. 1972), aff'g T.C. Memo. 1970-182. This is not one of those cases. The MDFB, an unrelated third-party lender, reviewed HRI's financial records and determined that HRI had sufficient assets or potential assets to repay the bridge loan in the event of default. Moreover, HRI pledged its membership interest in WAHD, which included HRI's preferred return and preferred return of capital rights, as collateral for repayment of the bridge loan.

But even if HRI could not repay the bridge loan, the record does not reflect that another party was obligated through guaranties, side agreements, or otherwise to repay HRI's obligation under the bridge loan in the event of default. The MDFB could seek recourse for default only against HRI.[9] Accordingly, this is not a case where the lender was in substance relying on a person secondarily

---

[9]We note certain HRI partners made guaranties with respect to obligations under the bridge loan, but their guaranties did not cover repayment of principal or interest under the bridge loan.

[*39] responsible for repayment. See, e.g., Selfe, 778 F.2d 769; Plantation Patterns, Inc. v. Commissioner, 462 F.2d 712.

Respondent urges the Court to use a "bona fide" indebtedness analysis to determine whether HRI was the borrower under the bridge loan. See, e.g., Welch v. Commissioner, 204 F.3d at 1230; Calloway v. Commissioner, 135 T.C. 26 (2010), aff'd, 691 F.3d 1315 (11th Cir. 2012); Haag v. Commissioner, 88 T.C. 604, 615-616 (1987), aff'd without published opinion, 855 F.2d 855 (8th Cir. 1988); Fisher v. Commissioner, 54 T.C. 905, 909 (1970); Goldstein v. Commissioner, T.C. Memo. 1980-273. That analysis generally focuses on whether a transaction constitutes genuine indebtedness or something else, e.g., a sale. See e.g., Welch v. Commissioner, 204 F.3d at 1230. There is no dispute between the parties that the bridge loan created indebtedness. Rather, the parties disagree about the identity of the bridge loan borrower. Accordingly, the bona fide indebtedness analysis is not persuasive to us given the facts of this case.

Respondent also argues that certain facts and circumstances surrounding the bridge loan show that GHP, rather than HRI, was the borrower in substance. In this regard, respondent contends that: (1) HRI failed to execute a promissory note with respect to the bridge loan; (2) HRI did not reflect the bridge loan obligations on its financial statements or tax returns; (3) HRI lacked sufficient

**[*40]** creditworthiness for the MDFB to extend the bridge loan to it; (4) the bridge loan proceeds were transferred directly to GHP; (5) GHP paid interest on the bridge loan; (6) GHP was entitled to the remaining funds set aside in an account to pay interest on the bridge loan; and (7) GHP paid certain bridge loan fees. We recognize that courts have analyzed such factors in the S corporation context when determining whether the loan obligor in substance is the entity or its owner. See, e.g., Maloof v. Commissioner, 456 F.3d 645 (6th Cir. 2006), aff'g T.C. Memo. 2005-75; Bolding v. Commissioner, 117 F.3d 270 (5th Cir. 1997), rev'g T.C. Memo. 1995-326; Reser v. Commissioner, 112 F.3d 1258 (5th Cir. 1997), aff'g in part, rev'g in part T.C. Memo. 1995-572; Harris v. United States, 902 F.2d 439 (5th Cir. 1990).

We begin by noting that of the factors respondent relies on, only the creditworthiness and the payment of interest and fees factors are probative of whether HRI or GHP was primarily responsible for repaying the bridge loan and thus are the only ones that we believe are entitled to significant weight. The record contradicts respondent's claim that HRI was not creditworthy for reasons already explained.[10]

---

[10]See discussion supra p. 38.

**[*41]**  As for respondent's claim that GHP made the $3,285,000 prepayment of two years' interest on the bridge loan, we do not find this factor helpful under these circumstances.  The master indenture required that $3,285,000 of the bridge loan proceeds deposited with the master trustee be immediately used to prepay the respective preferred returns owed to WAHD and HRI for their contributions of capital.  The prepaid preferred return of $3,285,000 was to be paid directly to the MDFB because the preferred return rights were pledged and collaterally assigned to the MDFB under WAHD collateral assignment agreement and the HRI collateral assignment agreement I.  It follows then that for the $3,285,000 prepaid interest payment made to the MDFB to have been paid by GHP, we would have to disregard the preferred-equity return obligations of WAHD and HRI.  This would require us to assume in respondent's favor the very question that we are analyzing:  Is HRI or GHP the borrower in substance?

Likewise, respondent's argument that GHP was entitled to the remaining amounts in the interest deposit account suffers from the same problem.  This is because GHP would ultimately be owed any remaining amount in the prepaid interest account for overpaying its preferred return obligation unless we disregard the preferred return obligations of GHP and WAHD and assume GHP was the borrower.  Accordingly, we do not find that GHP's transfer of a portion of the

[*42] bridge loan proceeds that were used toward interest owed on the bridge loan, or GHP's entitlement to amounts remaining in the interest account, show that GHP was the borrower.

As for the bridge loan fees, the record reflects that GHP paid the loan fees out of its operating account. The record also reflects that the MDFB sent the invoice for the bridge loan fees to HRI, indicating that the MDFB expected HRI to pay the fee. We think this factor supports respondent's position but is not fatal to finding that HRI was the true borrower in substance.

We find the remaining factors respondent cites insufficient to establish that HRI was not the borrower in substance. While it is true that HRI failed to execute promissory notes, we attach little significance to this failure. A promissory note is not required to evidence indebtedness. See Burk v. Walton, 86 S.W.2d 92, 95 (Mo. 1935); Kam, Inc. v. White, 675 S.W.2d 459, 461-462 (Mo. Ct. App. 1984); Reifeiss v. Barnes, 192 S.W.2d 427, 430 (Mo. Ct. App. 1946); see also Sandra Schnitzer Stern, Struct. & Drafting Com. Loan Agr. sec. 1.04 (1999). Indeed, a debt obligation may be evidenced by reference to the lender's books and records. See Stern, supra, sec. 1.04. We think HRI's execution of the bridge loan agreement itself was sufficient to evidence HRI's indebtedness to the MDFB for the bridge loan.

**[*43]**  We also attach little significance to the MDFB's transfer of the bridge loan proceeds directly to GHP.  We recognize some courts have found this factor to contribute to a finding that the recipient of the proceeds was the borrower in substance.  See, e.g., Estate of Leavitt v. Commissioner, 90 T.C. 206, 213-214 (1988), aff'd without published opinion, 875 F.2d 420 (4th Cir. 1989); Salem v. Commissioner, T.C. Memo. 1998-63, aff'd, 196 F.3d 1260 (11th Cir. 1999); Reser v. Commissioner, T.C. Memo. 1995-572.  These cases generally involved situations where the taxpayer and her S corporation were co-obligors on the indebtedness, or the taxpayer was claiming basis notwithstanding her status as a mere guarantor or surety.  Nonetheless, the disbursement and use of the loan proceeds by an entity controlled by the claimed borrower is not dispositive of the borrower's identity in a loan transaction.  See Bolding v. Commissioner, 117 F.3d 270; Raynor v. Commissioner, 50 T.C. 762 (1968); Miller v. Commissioner, T.C. Memo. 2006-125; Gilday v. Commissioner, T.C. Memo. 1982-242.

Finally, respondent points out that HRI failed to reflect the bridge loan obligation on its financial statements or tax returns.  While this failure could indicate that HRI did not view itself as the borrower under the bridge loan, it does not change that the MDFB viewed HRI as the borrower and as responsible for repayment of the bridge loan.  Nor does it change that HRI was in fact legally

[*44] obligated to repay the bridge loan under the bridge loan agreement. We do not find that HRI's omission of the bridge loan obligation on its financial statements or tax returns is fatal to concluding HRI was in substance the bridge loan borrower.

In sum, we recognize there were certain peculiarities surrounding the bridge loan transaction. Nevertheless, we find that the totality of circumstances shows that HRI and not GHP was in substance the bridge loan borrower.

## ii. The Step Transaction Doctrine

Respondent argues that we should apply the step transaction doctrine to disregard the form of the bridge loan and recast GHP as the bridge loan borrower. The step transaction doctrine is a variation of the substance over form doctrine. Penrod v. Commissioner, 88 T.C. 1415, 1428-1430 (1987). Under the step transaction doctrine, a particular step in a transaction is disregarded for tax purposes if the taxpayer could have achieved its objective more directly but instead included the step for no other purpose than to avoid tax liability. Long-Term Capital Holdings, LP v. United States, 150 Fed. Appx. 40, 43 (2d Cir. 2005) (citing Del Commercial Props., Inc. v. Commissioner, 251 F.3d 210, 213 (D.C. Cir. 2001)). On the other hand, the Commissioner may not "'generate events which never took place just so an additional tax liability might be

**[*45]** asserted.'" Grove v. Commissioner, 490 F.2d 241, 247 (2d Cir. 1973)

(quoting Sheppard v. United States, 361 F.2d 972, 978 (Ct. Cl. 1966), aff'g T.C.

Memo. 1972-98. Courts generally apply one of three alternative tests in deciding

whether to invoke the step-transaction doctrine and disregard a transaction's

intervening steps: (1) the binding commitment test; (2) the end result test; and (3)

the interdependence test. Superior Trading, LLC v. Commissioner, 137 T.C. 70,

88 (2011), aff'd, 728 F.3d 676 (7th Cir. 2013).

The doctrine's disregard or recharacterization of steps under any of the three

tests is predicated on the steps' being meaningless and done for the sole purpose

of avoiding tax. Turner Broadcasting Sys., Inc. v. Commissioner, 111 T.C. 315,

327 (1998); Esmark Inc. v. Commissioner, 90 T.C. 171, 195 (1988), aff'd without

published opinion, 886 F.2d 1318 (7th Cir. 1989); see also Linton v. United States,

630 F.3d 1211 (9th Cir. 2011). Moreover, the existence of an overall plan by itself

does not justify the application of the step transaction doctrine. Turner

Broadcasting Sys., Inc. v. Commissioner, 111 T.C. at 327.

As a threshold matter, the record does not reflect that the MDFB's making

the bridge loan to HRI was a meaningless or unnecessary step taken for the sole

purpose of avoiding Federal income tax. Testimony at trial by the MDFB's top

executive established that on the basis of HRI's and GHP's risk profiles, the

**[\*46]** MDFB considered HRI a more attractive borrower than GHP. This point is not insignificant. The favorableness of terms on which a borrower can obtain a loan is primarily based on the borrower's creditworthiness. Accordingly, HRI should have been able to obtain the bridge loan on better terms than GHP. We find that HRI serving as the borrower in the bridge loan transaction was neither meaningless nor occasioned solely to avoid tax. It follows that the successive capital contributions were also not meaningless and not arranged for the sole purpose of avoiding tax. We hold that the step transaction doctrine is not relevant to the bridge loan transaction.

### iii.  Conclusion

In conclusion, participating partners established that HRI was the bridge loan borrower in form and substance. It follows, the MDFB's transfer of the bridge loan proceeds (totaling $18,455,000) directly to GHP constituted a deemed capital contribution of them by HRI to WAHD and then a deemed capital contribution of those proceeds by WAHD to GHP. See supra pp. 26-27. It further follows that GHP's transfers of the Lennox MHTCs and Statler tranche 1 MHTCs to HRI as WAHD's assignee should be treated as partnership distributions in redemption of WAHD's preferred equity rights, unless they are otherwise properly recharacterized as taxable transfers.

**[\*47]** 2.  <u>Whether GHP's Transfer of the Relevant MHTCs Should Be Recast as a Taxable Sale</u>

Respondent argues that GHP's transfers of the Lennox MHTCs and the Statler tranche 1 MHTCs to WAHD must be recast as taxable sales under the substance over form doctrine, the step transaction doctrine, or alternatively under the disguised sale provisions of section 707(a)(2)(B).  We address each of these arguments in turn.

a.  <u>Respondent's Substance Over Form and Step Transaction Arguments</u>

Respondent argues that GHP disposed of the Lennox MHTCs and the Statler tranche 1 MHTCs to Firstar CDC for consideration used to pay the bridge loan.  GHP did not transfer the relevant MHTCs to Firstar CDC.  Rather, HRI transferred the Lennox MHTCs and the Statler tranche 1 MHTCs to Firstar CDC after receiving them (as WAHD's assignee) from GHP.  Respondent argues, however, that GHP disposed of them to Firstar CDC through a series of assignments by GHP, WAHD, HRI, and the MDFB.  After careful consideration, we found above that GHP did not assign the rights to the Lennox and Statler tranche 1 MHTCs to WAHD.  Without these initial assignments, respondent's argument that the credits were in substance disposed of by GHP to Firstar CDC through a series of assignments falls apart.

**[\*48]** Respondent also argues that GHP's transfers of the relevant MHTCs should be recast as a taxable sale under the step transaction doctrine. As previously explained, the existence of an overall plan by itself does not justify the application of the step transaction doctrine. Turner Broadcasting Sys., Inc. v. Commissioner, 111 T.C. at 327. Rather, the doctrine is applied to combine a series of individually meaningless steps or steps lacking a business purpose into a single transaction. Id. The distributions of the Lennox MHTCs and the Statler tranche 1 MHTCs were made pursuant to WAHD's preferred-equity rights. Those rights flowed from WAHD's deemed capital contribution, which was not a meaningless or unnecessary step in the transaction. Because a legitimate step created the rights, we find that the step satisfying the rights also was legitimate. Accordingly, we decline to alter the form of the transaction under the step transaction doctrine.

### b. Respondent's Disguised Sale Argument

Respondent also argues that part of WAHD's transfer of the bridge loan proceeds to GHP and GHP's transfer of the Lennox MHTCs and Statler tranche 1 MHTCs to WAHD taken together constitute a disguised sale under section 707(a)(2)(B) of subchapter K. As a general rule, if a partner engages in a transaction with a partnership other than in his capacity as such, the transaction

**[*49]** shall be treated as occurring between the partnership and one who is not a partner. Sec. 707(a)(1). A non-partner-capacity transaction includes related transfers between a partner and a partnership that when viewed together are properly characterized as a sale or exchange of property. Sec. 707(a)(2)(B). Such a transaction is commonly referred to as a disguised sale.

Section 1.707-3, Income Tax Regs., provides rules for identifying disguised sales. That section, however, by its terms applies to situations where a partner transferred property to a partnership in exchange for money or other property. WAHD transferred money rather than property to GHP and received property, i.e., the Lennox MHTCs and the Statler tranche 1 MHTCs, instead of money from GHP in a subsequent transfer. Section 1.707-6, Income Tax Regs., instructs that rules similar to those provided in section 1.707-3, Income Tax Regs., apply to determine whether a transfer of property by a partnership to a partner and a transfer of money or other consideration by a partner to a partnership are treated as a disguised sale. Accordingly, we apply similar rules to those in section 1.707-3, Income Tax Regs., to determine whether the transfers between WAHD and GHP constitute a disguised sale. We now turn to the relevant rules.

Section 1.707-3(b)(1), Income Tax Regs., instructs that a disguised sale occurs if on the basis of all the facts and circumstances two conditions are met:

**[*50]** (1) the partnership would not have transferred money or property to the partner but for the transfer of money or property to the partnership, and (2) in cases of transfers that are not simultaneous, the subsequent transfer is not dependent on the entrepreneurial risks of the partnership operations.

Two rebuttable presumptions apply to nonsimultaneous transfers. First, transfers occurring more than two years apart are presumed not to constitute a disguised sale unless the facts and circumstances clearly establish that the transaction is a disguised sale. Sec. 1.707-3(d), Income Tax Regs. Second, transfers occurring within two years are presumed to be a sale unless the facts and circumstances clearly establish otherwise. Sec. 1.707-3(c), Income Tax Regs.

WAHD's deemed transfer of the bridge loan proceeds to GHP occurred on December 14, 2000. A distribution of the Lennox MHTCs occurred in June 2002. The distribution of the Statler tranche 1 MHTCs occurred on December 30, 2002, more than two years after WAHD made the WAHD contribution to GHP. Accordingly, there is a rebuttable presumption that the Lennox MHTC distribution was a disguised sale and that the Statler tranche 1 MHTC distribution was not a disguised sale. With these presumptions in mind, we evaluate whether the facts and circumstances show that the relevant transactions constitute a disguised sale.

[*51] Section 1.707-3(b)(2), Income Tax Regs., provides a nonexhaustive list of factors taken into account on the earliest of the two transfers that may tend to prove the existence of a disguised sale. Those factors include:

(1) the timing and amount of the subsequent transfer is reasonably determinable at the time of the earlier transfer;

(2) the transferor has a legally enforceable right to the subsequent transfer;

(3) the partner's right to receive the subsequent transfer is secured;

(4) other persons have made or are legally obligated to make a contribution to the partnership to permit it to make the subsequent transfer;

(5) other persons have loaned or agreed to loan to the partnership the money or other consideration required to make the subsequent transfer, taking into account whether any obligations to lend are subject to contingencies of the partnership operation;

(6) the partnership incurs or is required to incur debt to provide the property to make the subsequent transfer, taking into account the ability of the partnership to incur said debt;

(7) the partnership has assets beyond the needs of its business which are available to make the subsequent transfer;

**[*52]** (8)  the partnership distributions, allocations, or control of partnership operations are designed to effect an exchange of the burdens and benefits of ownership of property;

(9)  the partnership distributions to the partner are disproportionately large in relation to the partner's general and continuing interest in partnership profits; and

(10)  the partner has no obligation to repay to the partnership the property transferred or such obligation is so distant in time that its value is small in relation to the property transferred to the other partner.  Sec. 1.707-3(b)(2), Income Tax Regs.

Section 1.707-3(f), Example (3), Income Tax Regs., also indicates that these factors may disprove the existence of a sale.  We now evaluate the enumerated factors to determine whether the transfers at issue are properly characterized as a disguised sale.

The first factor considers whether the timing and amount of a subsequent transfer are determinable with reasonable certainty at the time of an earlier transfer.  Sec. 1.707-3(b)(2)(i), Income Tax Regs.  When WAHD made the WAHD contribution to GHP, GHP did not promise to pay any amount of MHTCs at any time to WAHD.  The GHP amended operating agreement entitled WAHD to

[*53] a preferred return of capital upon the occurrence of an extraordinary event, which the agreement defined as the creation of new property, e.g, the issuance of MHTCs to GHP. That return was to be a distribution of available cashflow, or alternatively, in the sole discretion of HH, a distribution of property having an agreed fair market value equal to WAHD's capital contribution of the bridge loan proceeds. Accordingly, even if an extraordinary event occurred, the amount and timing of any subsequent transfer of MHTCs were uncertain because HH could choose to have GHP sell the credits and satisfy the preferred return of capital obligation from GHP's available cashflow.

HH's discretion to determine whether GHP would use property or available cashflow to satisfy WAHD's preferred return of capital right was more than a trivial right. The record reflects that the discretionary right was valuable to KC. In this regard, KC's Vice President of Tax testified that around the time of the hotel project KC was considering certain tax planning to use losses, including capital losses, from its foreign operations. He further testified that there was a "good possibility" that gain from selling MHTCs at the GHP level could have been used by KC to offset excess capital losses or capital loss carryovers that might otherwise expire unused. Under such circumstances, 99% of the gain from the relevant sales of MHTCs would have flowed through to KC without any tax

**[*54]** paid on the allocation of gain, providing the company with additional basis in its GHP membership interest equal to the amount of gain (thereby reducing its gain on a subsequent disposition).[11]

The amount and timing of any subsequent distribution from available cashflow was also uncertain. GHP's available cashflow equaled its cash receipts reduced by its cash expenses for a given fiscal period. Accordingly, GHP could not make the preferred return of capital distribution to WAHD to the extent it had an operating deficit for a fiscal period. Whether GHP would incur an operating deficit depended on GHP's operations. That GHP would incur an operating deficit was not an insignificant risk given the complexity and scale of the hotel project. Indeed, such risk materialized during the hotel project.

Moreover, even if GHP had available cashflow, its ability to distribute it as a preferred return of capital was limited. GHP's cash receipts included proceeds GHP obtained from various financings to fund the hotel project. The master indenture placed restrictions on the use of the proceeds and the priorities of payments from the proceeds, thus restricting GHP's ability to distribute available

---

[11]If GHP sold the credits, HH would be entitled to 99% of the income from the sale and be required to pick up 99% of the gain.

[*55] cashflow.[12]  Accordingly, we find that the amount of any preferred return of capital to WAHD, whether in the form of MHTCs or cash, was not determinable with reasonable certainty.

Respondent argues that the first factor weighs in favor of finding a disguised sale because the amount and timing of the MHTCs generated by the hotel project could be determined with reasonable certainty.  We have doubts about whether the MHTCs the hotel project would generate could be determined with reasonable certainty given the significant business, economic, and legal risks associated with a complex real estate development project such as the hotel project.[13]  Moreover, even if the parties could have determined with reasonable certainty the timing and amount of MHTCs the hotel project would generate, the

---

[12]We also note that under Missouri law, WAHD was treated as an equity holder.  See Mo. Ann. Stat. sec. 347.015(11) (West 2001).  Consequently, GHP was prohibited from making any distribution to WAHD to the extent it would (i) prevent it from paying its obligations as they became due, or (ii) the distribution would render GHP insolvent.  See id. sec. 347.109.

[13]For example, with respect to the timing of the MHTCs, the project completion date could have been significantly extended by a variety of factors, including labor strife, latent conditions, weather events, or the mismanagement of the project.  The amount of the MHTCs generated by the hotel project could have been less than expected if the hotel project was completed under budget, given the MHTCs generated by the hotel project were a function of eligible expenses.  And legislative action by the State of Missouri could have reduced or eliminated the value of the MHTCs at a time when WAHD's preferred equity remained at risk.

[*56] amount and timing of the <u>transfer</u> of any MHTCs to WAHD still remained uncertain because of HH's discretionary right to decide whether GHP would satisfy WAHD's preferred equity right with MHTCs or available cashflow. We find that the first factor weighs against disguised sale treatment.

The second factor considers whether the transferor had a legally enforceable right to the subsequent transfer. Sec. 1.707-3(b)(2)(ii), Income Tax Regs. As we previously found, HH had unrestricted discretion to satisfy WAHD's preferred return of capital right by distributing available cashflow as allowed under the master indenture, or alternatively by distributing property having a fair market value equal to WAHD's capital contribution. Accordingly, WAHD did not have a legally enforceable right to the MHTCs. This factor weighs against disguised sale treatment.

The third factor is whether the partner's right to receive the transfer of money or other consideration is secured in any manner, taking into account the period during which it is secured. Sec. 1.707-3(b)(2)(iii), Income Tax Regs. Respondent argues that this factor is met because HH waived its discretion to make the distribution of the MHTCs to WAHD under the GHP amended operating agreement, thus ensuring that the MHTCs once generated would be distributed to WAHD. As previously explained, HH did not waive its discretion to distribute the

[*57] MHTCs as a preferred return of capital to WAHD. Accordingly, respondent's argument fails. Additionally, the record does not otherwise reflect that WAHD's potential right to a preferred return of capital was secured by GHP's assets or otherwise.[14] This factor weighs against disguised sale treatment.

Under the fourth factor we consider whether any person has made or is legally obligated to make "contributions" to the partnership to allow the partnership to make the transfer of money or other consideration. Sec. 1.707-3(b)(2)(iv), Income Tax Regs. Respondent argues that the insurance company that provided insurance coverage against the nonreceipt of MHTCs was obligated to make a contribution so that GHP could make the preferred return of capital to GHP.

We understand the term "contribution" under the fourth factor to mean the transfer of property or money that gives the transferor some equity interest in the partnership. The insurance company agreed to insure against GHP's non-receipt of the MHTCs in consideration for insurance premiums paid by GHP. Hence,

_____

[14]GHP insured against the nonreceipt of the MHTCs. We do not view this as "securing" WAHD's right to receive the preferred return of capital because WAHD did not have a direct or sole interest in the insurance proceeds; thus, proceeds could be used to satisfy GHP's obligations, including claims of third-party creditors. That is, we understand "secured" in the traditional sense as providing an interest in property.

[*58] GHP's receipt of the insurance proceeds would not give the insurance company an equity interest in GHP. Accordingly, GHP's argument that the insurance coverage shows a third party was obligated to make a contribution to GHP to permit GHP to make the preferred return of capital distribution to WAHD lacks merit.[15]

The record does not otherwise reflect that any person contributed or was obligated to make a contribution to GHP to allow it to make a preferred return of capital distribution to WAHD. We find this factor weighs against disguised sale treatment.

Under the fifth and sixth factors we consider whether a third party or the partnership has incurred debt or is obligated to incur debt to enable the partnership to make the second transfer. Sec. 1.707-3(b)(2)(v) and (vi), Income Tax Regs.

---

[15]We note that even if GHP's receipt of the insurance proceeds constituted a contribution, the record does not reflect that that contribution would have been made to permit GHP to satisfy WAHD's preferred return of capital right. That is, while the receipt of the insurance proceeds would have increased GHP's cash receipts, the record does not reflect that the insurance coverage was maintained for the specific purpose of allowing GHP to satisfy WAHD's preferred return of capital right. Nor does the record reflect that the proceeds would necessarily be used for that purpose. As previously discussed, a cash distribution to satisfy WAHD's preferred return of capital right could only be made from GHP's available cashflow and then only if the master indenture permitted the distribution. The proceeds then could have been used to satisfy GHP's operating expenses or other obligations that took priority under the master indenture.

[*59] The record does not reflect the incurring or obligation to incur such debt by a third party or GHP. This factor weighs against finding that a disguised sale occurred.

The seventh factor is whether the partnership has excess liquid assets that it can use to make the subsequent transfer. Sec. 1.707-3(b) (2) (vii), Income Tax Regs. Respondent does not address this factor in his analysis. We note, however, that GHP did not have excess liquid assets to allow it to make the distribution to WAHD. In fact, GHP had no liquid assets until the moment the MHTCs were issued to it. All of GHP's property was held by the master trustee and pledged to the master trustee to service GHP indebtedness incurred in connection with the hotel project.

Under the eighth factor we consider whether the partnership distributions, allocation, or control of partnership operations is designed to effect an exchange of the burdens and benefits of ownership of property. Sec. 1.707-3(b)(2)(viii), Income Tax Regs. Respondent contends that the GHP amended operating agreement and HH's intervention in the WAHD collateral assignment agreement transferred to WAHD all rights to GHP's expected MHTCs from the hotel project. Respondent contends that this purported transfer was designed to effect an exchange of the burdens and benefits of ownership of the MHTCs. Again, we

[*60] disagree that the relevant agreements transferred the ownership rights of the expected MHTCs to WAHD. Consequently, respondent's argument fails. We find this factor weighs against disguised sale treatment.

The ninth factor is whether the transfer of money or property by the partnership to the partner is disproportionately large in relation to the partner's interest in partnership profits. Sec. 1.707-3(b)(2)(ix), Income Tax Regs. WAHD had a 1% interest in the profits and losses of GHP and received 100% of the MHTCs. Accordingly, the transfer of the MHTCs did not bear any relationship to WAHD's general and continuing interest in GHP profits. This factor points toward disguised sale treatment.

Finally we consider whether the partner has no obligation to return or repay the subsequent distribution to the partnership. Sec. 1.707-3(b)(2)(x), Income Tax Regs. Neither the GHP amended operating agreement nor any other agreement obligated WAHD to return or repay GHP for the Lennox MHTCs and the Statler tranche 1 MHTCs when it made the deemed transfer of the bridge loan proceeds to GHP. Accordingly, WAHD received those MHTCs unencumbered.

Participating partners contend that WAHD was required to fund certain GHP operating deficits and in fact did fund GHP operating deficits during 2003. Participating partners conclude on these facts that WAHD was obligated to repay a

[*61] substantial portion of the value of the MHTCs it received. We are not persuaded. Under this factor, we focus on obligations arising from the subsequent transfer, not general partnership obligations that a partner has independent of the transfer, such as WAHD's obligation to fund certain operating deficits. This factor weighs in favor of finding a disguised sale occurred.

On balance, 2 of the 10 factors support disguised sale treatment; the remaining factors weigh against such treatment. The weight to be given to each of the factors depends on the particular case. Sec 1.707-3(b)(2), Income Tax Regs. In this case we find the first and second factors most compelling. In our evaluation of the first factor, we determined that the timing and amount of any distribution of MHTCs or their economic equivalent by GHP to WAHD was uncertain. And applying the second factor, we concluded that WAHD never had a legal right to any MHTCs GHP earned. These factors strongly indicate that WAHD's preferred-equity contribution was subject to the entrepreneurial risk of GHP's partnership operations. Upon our evaluation of all the factors, we decline to recharacterize GHP's transfers of the Lennox and Statler tranche 1 MHTCs as a disguised sale.

Participating partners argue that if they did constitute a disguised sale, the gain from the sale would have been reportable for 2000, a closed year, because

[*62] WAHD's deemed transfer of the bridge loan proceeds to GHP constituted an advance payment. We agree. The disguised sale is considered to occur when under general principles of Federal tax law the partnership is considered the owner of the property. Sec. 1.707-3(a)(2), Income Tax Regs. Advance payments, however, for goods or services are generally taxable in the year of receipt. Schlude v. Commissioner, 372 U.S. 128 (1963); Am. Auto. Ass'n v. United States, 367 U.S. 687 (1961); Auto. Club of Mich. v. Commissioner, 353 U.S. 180,188-190 (1957); see also sec. 1.451-1(a), Income Tax Regs.; cf. Commissioner v. Indianapolis Power & Light Co., 493 U.S. 203, 208 n.3 (1990). The receipt of money generally constitutes an advance payment where the taxpayer has the unconditional right to keep the money so long as the taxpayer fulfills his or her side of the bargain. Cf. Commissioner v. Indianapolis Power & Light Co., 493 U.S. at 210-211.

Assuming GHP's transfers of the Lennox MHTCs and the Statler tranche 1 MHTCs constituted a disguised sale, part of WAHD's deemed capital contribution of the bridge loan proceeds to GHP in 2000 constituted the purchase price for the MHTCs. Hence, WAHD's capital contribution was GHP's to keep so long as it transferred the purchased credits. Accordingly, WAHD's capital contribution to

**[*63]** GHP was an advance payment made in 2000 and thus was includible in GHP's income in a prior year not before this Court.

Respondent argues that the participating partners' argument lacks merit because the deemed transfer of the bridge loan proceeds by WAHD to GHP was a loan (which was satisfied by the transfer of MHTCs in 2002) or a deposit for the future sale of MHTCs. Consequently, respondent concludes that disguised sale income from the relevant transfers would be reportable in 2002. Respondent's argument is untenable on its face. If we assume a disguised sale occurred, as respondent contends, then part of WAHD's deemed transfer of the bridge loan proceeds to GHP necessarily constituted consideration for the purchase of the Lennox MHTCs and the Statler tranche 1 MHTCs and therefore could not have been a loan or a deposit.

Respondent also argues that the duty-of-consistency doctrine bars GHP from taking the position that 2000 is the correct tax year for reporting income attributable to a disguised sale of the Lennox MHTCs and the Statler tranche 1 MHTCs. The duty-of-consistency doctrine precludes a taxpayer from taking one position one year and a contrary position in a later year, after the limitations period has run for the first year. Herrington v. Commissioner, 854 F.2d 755, 757 (5th Cir. 1988), aff'g Glass v. Commissioner, 87 T.C. 1087 (1986).

**[\*64]**  We do not believe the duty-of-consistency doctrine is applicable because GHP has not changed its position.  GHP maintained on its returns and throughout this case that it did not sell the Lennox MHTCs or the Statler tranche 1 MHTCs.  Moreover, despite respondent's assertion to the contrary, GHP's taking the position that any income attributable to a disguised sale is includible in 2000 does not constitute a change of position.  That is, we think GHP's taking a position about the legal effects flowing from the Court's rejecting its primary position and sustaining respondent's position does not constitute a change of position for purposes of the duty-of-consistency doctrine.

### 3. Conclusion

We found WAHD made a deemed capital contribution of the bridge loan proceeds to GHP entitling it to a preferred return of capital and could receive cash or property, including MHTCs, in redemption of its preferred equity.  We found unpersuasive respondent's argument that GHP's transfer of the Lennox MHTCs and the Statler tranche 1 MHTCs should be recast as a taxable sale under the substance over form doctrine, step transaction doctrine, or the disguised sale rules.  For these reasons, we agree with participating partners that GHP's transfers of the Lennox MHTCs and the Statler tranche 1 MHTCs to HRI as WAHD's assignee

**[\*65]** are properly characterized as partnership distributions. Consequently, under section 731(b) GHP was not required to recognize any gain or loss on those distributions.

B. The Statler Tranche 2 MHTCs

We now address the treatment of GHP's transfer of the Statler tranche 2 MHTCs. Participating partners contend that GHP sold $1,293,935 of the Statler tranche 2 MHTCs to Firstar CDC and distributed the remaining $2,938,940 to HRI as WAHD's assignee. Respondent argues that GHP sold all the Statler tranche 2 MHTCs to Firstar CDC and therefore must include all the proceeds from that sale in income. We agree with respondent.

Participating partners argue that the form of the January 8, 2003, transfer controls the transaction's character. GHP transferred all of the Statler tranche 2 MHTCs to Firstar CDC on December 30, 2002. On January 8, 2003, GHP asked the MDED to amend its transfer records to reflect that a portion of the Statler tranche 2 MHTCs transfer represented a distribution to HRI. We find that the December 30, 2002, transfer controls our analysis of the transaction. While GHP attempted to rescind the initial December 30, 2002, transfer of the Statler tranche 2 MHTCs, rescission must occur in the same tax year as the initial transaction if the initial transaction is to be disregarded for tax purposes. See Rev. Rul. 80-58,

**[*66]** 1980-1 C.B. 181. GHP did not attempt to rescind the initial transfer until after its 2002 tax year. Accordingly, the rescission attempt was ineffective. The December 30, 2002, transfer constituted a sale of the full amount of the Statler tranche 2 MHTCs, and GHP must include all of the proceeds in income.

Without citing any authority, participating partners suggest that we should ignore the initial December 30, 2002, transfer of the Statler tranche 2 MHTCs because the MDED made a mistake in making the transfer; i.e., the transfer was not intended. On this point, participating partners contend that GHP intended to request that the MDED transfer MHTCs with a fair market value of $13,388,503 to HRI and any MHTCs in excess of that amount to Firstar CDC through the December 16, 2002, cover letters accompanying the Missouri Forms HTC-T, also dated December 16, 2002.[16] They argue that the MDED misinterpreted the transfer request instructions in those cover letters, which HRI sent to the MDED on GHP's behalf. As a result, they contend the MDED transferred MHTCs with a credit value of $13,388,503 to HRI instead of fair market value of that amount,

---

[16]As of December 16, 2002, the exact amount of MHTCs that would be generated by the Statler project was uncertain, and it did not become certain until December 30, 2002. Apparently as a result of this, GHP left blank the amount of MHTCs to be transferred to Firstar CDC on the Missouri Form HTC-T dated December 16, 2002. It requested, however, that the MDED fill in the blank with the amount of MHTCs exceeding the "the first $13,388,503 of the awarded credits" once the amount of MHTCs generated by the Statler project was finalized.

[*67] causing more MHTCs than they intended to be transferred directly to Firstar CDC. They claim the transfer request instructions in the cover letter were misinterpreted because they were vague. We are not persuaded.

The cover letters are arguably vague as to whether MHTCs with a credit value or fair market value of $13,388,503 are to be transferred to HRI and consequently the amount of excess MHTCs that are to be transferred to Firstar CDC. However, the accompanying Missouri Forms HTC-T dated December 16, 2002, and executed by GHP and HRI provide important context regarding the meaning and intent of the cover letter instructions and more generally GHP's intent to make the Statler tranche 2 MHTCs transfer. In the Missouri Forms HTC-T dated December 16, 2002, GHP and HRI both reference the credit value of the relevant MHTCs to be transferred as $13,388,503 and acknowledge that those credits were to be sold at .83 cents per credit for a total of approximately $11.1 million, i.e., the MHTCs fair market value. This undercuts participating partners' contention that the MDED misinterpreted the cover letter instructions and that GHP did not intend to transfer MHTCs with a credit value of $13,388,503 to HRI and consequently did not intend to transfer the excess Statler MHTCs having a credit value of $4,232,475 (i.e., the Statler tranche 2 MHTCs) to Firstar CDC.

[*68] On the basis of our review of the cover letters and the Missouri Forms HTC-T, we are not convinced that the Statler tranche 1 MHTCs transfer was unintended. It follows that GHP has also failed to prove that the Statler tranche 2 MHTCs transfer was unintentional because the amount of MHTCs from the Statler project that GHP intended to transfer to Firstar CDC depended on the amount of the Statler MHTCs that it instructed the MDED to transfer to HRI. Accordingly, we will not disregard the Statler tranche 2 MHTCs transfer.

We thus now consider the tax consequences of the Statler tranche 2 MHTCs transfer. In that transfer, GHP sold all of the Statler tranche 2 MHTCs to Firstar CDC. Firstar CDC transferred $1,293,535 of the proceeds directly to GHP. GHP does not dispute that these proceeds are includible in income. The remainder of the sale proceeds were transferred to the MDFB, which applied them against HRI's bridge loan liability. That GHP did not actually receive the proceeds does not allow it to avoid having to take the proceeds into income.

Section 61(a) provides in part that "gross income means all income from whatever source derived". It is fundamental to our system of taxation that income must be taxed to the one who earns it. See Commissioner v. Culbertson, 337 U.S. 733, 739-740 (1949). The incidents of taxation cannot be avoided through an anticipatory assignment of income. See United States v. Basye, 410 U.S. 441,

[*69] 447, 449-450 (1973); <u>Lucas v. Earl</u>, 281 U.S. 111, 114, 115 (1930).  A taxpayer realizes income if he controls the disposition of that which he could have received himself but diverts to another as a means of procuring the satisfaction of his goals. The receipt of income by the other party under such circumstances is merely the fruition of the taxpayer's economic gain.  See <u>Commissioner v. Sunnen</u>, 333 U.S. 591, 605-606 (1948); <u>Helvering v. Horst</u>, 311 U.S. 112, 116-117 (1940).  GHP could have received all of the proceeds from the Statler tranche 2 MHTCs sale but chose, if not directly then tacitly, to divert a certain amount of the proceeds to the MDFB for use against HRI's bridge loan liability.  Accordingly, under the assignment-of-income doctrine those proceeds are includible in GHP's income.[17]

_____

[17]We note that participating partner's alternative argument that any unreported income from the sale of MHTCs is includible for 2000, a closed year, does not apply to GHP's income from the Statler tranche 2 MHTCs transfer.  That argument is predicated on WAHD's capital contribution in 2000 having been treated under the disguised sale rules as a payment to GHP for the MHTCs it subsequently transferred to WAHD in 2002.  The sale of the Statler tranche 2 MHTCs was to Firstar CDC, not WAHD.   Moreover, Firstar CDC did not make any payment to GHP in 2000; rather, it made payments to GHP directly and indirectly in 2002.  Accordingly, Firstar CDC did not make any advance payment in a closed year to GHP as contemplated under participating partner's alternative argument for excluding income from the sale of MHTCs for 2002.

[*70] III.  Treatment of the Developer Fee

The next issue we address is whether GHP must include in income the $3,088,000 transferred to it from the deferred developer fees fund.  The transfer occurred in February 2003 when GHP had an operating deficit and before the commencement-of-operations date had been reached.  The GHP amended operating agreement treats the transfer as a deemed payment by WAHD to GHP in satisfaction of its obligation to fund certain GHP operating deficits.  But the GHP amended operating agreement instructs that the deemed payment shall not be treated as a loan or capital contribution to GHP by WAHD and shall not affect WAHD's membership interest or allocation of profits or losses.

Respondent argues that because the GHP amended operating agreement treats the transfer as a payment from WAHD and GHP received the transfer with no corresponding obligation to WAHD, GHP had an accession to wealth and the receipt of funds constitutes income.  See sec. 61.  Participating partners argue that the transfer is properly characterized as a capital contribution and is therefore excludible from GHP's income.  Both respondent's argument and participating partners' argument assume that WAHD made the transfer or payment of the $3,088,000 amount from the deferred developer fees fund to GHP.  We find that

[*71] assumption is incorrect and therefore disagree with both respondent's and participating partners' characterization of the transfer.

GHP transferred money to the deferred-development-fees fund, including the $3,088,000 transferred from the fund to GHP. The money in the deferred-development-fees fund was held by the master trustee in trust and was to be applied in accordance with the master indenture. Both WAHD and GHP had certain rights to money in the deferred-development-fees fund after GHP transferred it.

Before the commencement-of-operations date, GHP had the right to use any unpaid money to fund its operating deficits and had no obligation to repay any amounts withdrawn. WAHD had a right to three installments of the development fee if certain construction and financial targets were met. The first installment from the deferred-development-fees fund was to be paid upon the completion of the rehabilitation of the Lennox Hotel, the second upon the commencement-of-operations date, and the final upon a certain debt service coverage ratio for one full year after the commencement-of-operations date. If the relevant achievements occurred, the amount of the second and third installments depended on the amount of funds available in the deferred-development-fees fund on the achievement

[*72] dates.[18]  Accordingly, GHP's use of money in the deferred-development-fees fund could reduce the amount of the second and third installments.  With these rights in mind, we turn to the characterization of the transfer of the $3,088,000 from the deferred-development-fees fund to GHP.

While the GHP amended operating agreement characterizes the transfer as a deemed payment from WAHD to GHP, the incidence of taxation must turn on the transaction's substance.  Commissioner v. Court Holding Co., 324 U.S. at 334.  Because the $3,088,000 was transferred to GHP before the commencement-of-operations date, GHP had the right to use the money in the deferred-development-fees fund to fund its operating deficits with no obligation to return the money.  WAHD, on the other hand, had not earned the $3,088,000 transferred to GHP.  Accordingly, WAHD had no right to the amount once used by GHP as the transfer was before the commencement-of-operations date and the transfer reduced the amount of any potential second installment.  Hence, GHP never relinquished its beneficial ownership of the $3,088,000 from the time it transferred the money into the deferred-development-fees fund until it was returned to GHP.  The transfer of

---

[18]For example, if there was less than $3,088,000 upon the commencement-of-operations date, the amount of the second installment would be zero.  And if one year after the commencement-of-operations date there were no funds in the deferred-development-fees account, the amount of the third installment would be zero.

[*73] the $3,088,000 from the deferred-development-fees fund to GHP then was in substance a return of principal and is not taxable income to GHP.

IV.  Accuracy-Related Penalty

Respondent contends that GHP is liable for a 20% accuracy-related penalty for 2002 under section 6662(a) and (b)(1) on any underpayment resulting from GHP's omitting the Statler tranche 2 MHTCs sale income because the underpayment was due to negligence or disregard of rules or regulations. Negligence is defined as any failure to make a reasonable attempt to comply with the Code or to exercise ordinary and reasonable care in the preparation of a tax return.  Sec. 1.6662-3(b)(1), Income Tax Regs.  A return position that has a "reasonable basis" is not attributable to negligence.  Id.  The term "disregard" is defined as any careless, reckless, or intentional disregard.  Disregard of rules or regulations is careless if the taxpayer does not exercise reasonable diligence to determine the correctness of a tax return position that is contrary to rules or regulations.  Sec. 1.6662-3(b)(2), Income Tax Regs.

GHP transferred the Statler tranche 2 MHTCs to Firstar CDC in exchange for consideration during its 2002 tax year.  It later attempted to unwind that transfer.  As we previously held, GHP failed to establish that the initial transfer of the Statler tranche 2 MHTCs to Firstar CDC should be disregarded for Federal tax

[*74] purposes. Considering all the facts, we believe GHP lacked a reasonable basis to believe the initial transfer was ineffective. Accordingly, we find that its failure to report part of the income from that sale was negligent or at least a careless disregard of the relevant rules or regulations. Thus, respondent has made a prima facie case for imposing the penalty.

The section 6662(a) accuracy-related penalty does not apply to any portion of the underpayment as to which the taxpayers establish that they acted with reasonable cause and in good faith. See sec. 6664(c)(1); Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 98 (2000), aff'd, 299 F.3d. 221 (3d Cir. 2002). The decision as to whether the taxpayer acted with reasonable cause and in good faith depends upon all the pertinent facts and circumstances, including the taxpayer's efforts to assess his proper tax liability, the taxpayer's knowledge and experience, and the reliance on the advice of a professional. See sec. 1.6664-4(b)(1), Income Tax Regs. For a taxpayer to reasonably rely on the advice of a professional so as to possibly negate a section 6662 accuracy-related penalty, the taxpayer must prove by a preponderance of the evidence that he meets each requirement of the following three-prong test: (1) the adviser was a competent professional who had sufficient expertise to justify reliance; (2) the taxpayer provided necessary and accurate information to the adviser; and (3) the taxpayer

[*75] actually relied in good faith on the adviser's judgment.  Neonatology

Assocs., P.A.v. Commissioner, 115 T.C. at 99.

Participating partners argue that the reasonable cause and good faith defense

applies here because they relied on the Baker & McKenzie tax opinion in omitting

the relevant portion of income from the sale of the Statler tranche 2 MHTCs.  We

disagree.

The Baker & McKenzie tax opinion addresses the treatment of anticipated

distributions of MHTCs from GHP to WAHD.  The opinion was provided to GHP

two years before the Statler tranche 2 MHTCs were transferred to Firstar CDC.  It

does not opine on or even mention the tax treatment, including the effectiveness,

of the initial December 30, 2002, transfer of the Statler tranche 2 MHTCs to

Firstar CDC.  Put another way, the opinion does not analyze the transaction

resulting in the underpayment.  It follows that GHP could not have relied in good

faith on the Baker & McKenzie tax opinion in omitting income from its sale of the

Statler tranche 2 MHTCs to Firstar CDC.  Consequently, we find that participating

partners have failed to show GHP reasonably relied on professional advice or

acted with reasonable cause or in good faith in taking the position resulting in the

underpayment.  Accordingly, we sustain the accuracy-related penalty on the

**[\*76]** portion of the underpayment due to GHP's failure to report income from its sale of the Statler tranche 2 MHTCs to Firstar CDC.

We have considered all remaining arguments the parties have made and, to the extent not addressed, we find them to be irrelevant, moot, or meritless.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.